123 So.2d 815 (1960)
Silas F. TALBERT, Plaintiff-Appellee,[*]
v.
BOUNDS & ALLEN et al., Defendants-Appellants.
No. 9202.
Court of Appeal of Louisiana, Second Circuit.
June 22, 1960.
On Rehearing October 27, 1960.
*816 George T. Anderson, Jr., Coushatta, for Bounds & Allen, defendant-appellant.
Wilkinson, Lewis, Wilkinson & Madison, Shreveport, for Aetna Casualty & Surety Company, defendant-appellant.
Colvin & Hunter, Mansfield, attorneys for plaintiff-appellee.
AYRES, Judge.
This action, a concursus proceeding, was instituted under the provisions of LSA-R.S. 9:4804 by plaintiff as the owner of the Lazy "S" Ranch in DeSoto Parish, Louisiana, upon which, under a contract of June 21, 1956, with Bounds & Allen, a residence was constructed under the supervision of Lester C. Haas, architect, pursuant to plans and specifications prepared by him. For the faithful performance of the contract and for the payment of all labor and materials utilized in the prosecution and completion of the work undertaken, The Aetna Casualty and Surety Company executed its bond in the amount of the contract price of $47,697.
With the filing of this action, plaintiff deposited in the registry of the court, the sum of $1,427.47, as the amount allegedly due by him to the contractors, and prayed that (1) the deposit be accepted and received, not only for the benefit of plaintiff and the aforesaid contractors and surety but, also, for the benefit of the subcontractors, laborers, and furnishers of the material, who may be entitled to participate in the distribution of said fund, (2) the contractors and surety be condemned for all amounts due and owing for labor, materials, and services rendered and performed in connection with the aforesaid improvement, (3) the cost of the proceedings, including the cancellation of the liens filed *817 against the property and an attorney's fee for plaintiff's counsel in provoking this concursus, be paid from the fund deposited, or by the contractor and/or surety, and (4) plaintiff have judgment against the contractors and surety for all amounts which he, as owner, may be required to pay for said construction.
Silas F. Talbert, the owner of the property involved, and for whom the residence was constructed, died subsequent to the institution of this proceeding. Thereafter, Mrs. Amelia H. Talbert, surviving widow, as testamentary executrix, was substituted as party plaintiff.
This controversy is between the owner's succession representative and the contractors and surety inasmuch as the surety has paid all outstanding claims against the property. By assignment and acts of subrogation, the surety has acquired all such claims, amounting to $14,943.69. The contractors and surety reconvened and prayed for judgment against the owner for sums allegedly due by the owner for extra work and services performed by the contractors. These extras are itemized as follows:

1. Laying foundations for
 a water fountain $ 460.00
2. Material and labor in
 replacing defective
 sheetrock ceiling 9,221.66
3. Charges for water and
 electricity during
 construction 356.71
4. Extra labor in laying
 brick of the pattern
 and design selected
 by the owner 1,300.00
5. Extras approved and
 itemized by the
 architect 1,698.10
 ____________
 Total $13,036.47
 ============

In addition, the surety reconvened for the further sum of $4,139.85, allegedly due because of a premature and prejudicial payment to the contractors of a portion of the contract price, or for a total of $17,176.32. The surety also prayed that it be decreed entitled to the deposit and, in reconvention, for judgment against the owner for the aforesaid sum.
The owner's liability under the contract was determined and recognized in the sum of $2,054.81, against which credit was allowed for $342.13, representing work not done, or work incorrectly done, by the contractors. Out of the deposit made, an attorney's fee of $400 was fixed and ordered paid. The balance thus found to be due by the owner was $1,312.68, leaving a surplus of $114.79 in the deposit which was then applied to supplement the attorney's fee. The owner's succession representative was discharged from further liability unto the contractors, the surety, and lien claimants. The reconventional demands of the contractors and the surety were rejected. From a judgment thus rendered and signed, the contractors and surety, referred to herein as defendants, appealed.
The contention of the defendants is that the court erred in its failure to allow recovery against the owner's succession representative for the items constituting their aforesaid reconventional demands. These contentions will now be discussed and given consideration in the order listed.
The first for consideration is the claim for material and labor for the construction of a concrete foundation for a water fountain. This item was included under a separate contract, by the owner with Powell & Akin, for landscaping the residential site. Powell & Akin, however, subcontracted this portion of the work to plaintiff's principal contractors, Bounds & Allen. The trial court, on concluding this construction was not included in the general contract or covered by the surety's bond, excluded all evidence concerning it. Consequently, the rights of the parties will be preserved, as to this portion of the claim, by its rejection as of nonsuit.
Second, for consideration, is the claim for material and labor required in *818 replacing defective sheetrock ceiling. That the sheetrock purchased and originally installed in the ceiling was defective and unfit for the purpose is clearly established by the record. In fact, this was conceded by all parties concerned, including the architect and a representative of the manufacturer who made an inspection, at the residential site, of the sheetrock as originally used. The record leaves no doubt that the defectiveness was due to an imperfection in the composition of the material. After being nailed to the laths or ceiling joists, the nailheads would sink into and/or pull through the sheetrock, leaving holes. It could not be substantially nailed. While on the job site, the representative of the manufacturer suggested the use of sheetrock of 1/2-inch thickness instead of 3/8-inch thickness as designated in the plans and specifications. This, the contractors did without any expressed authority of the owner or of the architect.
Whose responsibility is it for the payment of the cost of this additional sheetrock and the labor required for its installation? The contractors and surety contend that the sheetrock originally furnished and installed complied with the specifications in that it was of a standard brand of manufacture and of the thickness designated, and that it was properly installed according to customary methods and best practices of the trade. When the material was delivered, the manufacturer's labels, attached to the packages, indicated the material was of the kind and quality designated in the specifications. That 3/8-inch sheetrock is ordinarily and customarily used as ceiling is established by the record, and the imperfection of the material is not attributable to its thickness.
The contract provided that the contractors furnish all of the materials and perform all of the work required for the completion of the residence. The contract specifically recited that all materials be new and that both workmanship and material be of good quality. This requirement is not met by the furnishing and installation of defective material despite the fact the material bears the manufacturer's label indicating its quality meets the specifications.
The obligation of the contractors was to furnish and install materials of good quality. This, they did not do. The manufacturer's representations as to the quality of the product used by a contractor are insufficient and afford the contractor no defense to a claim by an owner for the use of defective materials.
Moreover, Art. 19 of the general conditions, constituting a part of the contract, provides:
"The Contractor shall promptly remove from the premises all work condemned by the Architect as failing to conform to the Contract, whether incorporated or not, and the Contractor shall promptly replace and re-execute his own work in accordance with the Contract and without expense to the Owner * * *." (Emphasis supplied.)
This item was therefore properly disallowed as a claim against the owner.
Third, no contention is raised as to the correctness of the charge for water and electricity assessed to the owner. The charge is in accordance with a provision of the contract reciting that "water and electricity shall be furnished by owner."
Fourth, nor do we find any merit in the contractors' and surety's claims for additional compensation for the brickwork. The basis of the claim is that "Holiday Hill Stone" was specified in the plans and specifications, whereas the owner selected "Ribbonstone." The specifications particularly designated "Holiday Hill Stone, Bermuda Pink color" and recited that the "Color of mortar and bond pattern shall be as selected by Architect." "Holiday Hill Stone" is a masonry product manufactured by Texcrete Company and the name is a generic trademark. Three sizes or patterns *819 are available: "Ribbonstone," "Ledgestone," and "Cliffstone," all of which have a uniform width of 3 5/8 inches and a length of 15 5/8 inches, but thicknesses of 1 5/8 inches, 2 ¼ inches, and 3 5/8 inches, respectively. It is therefore claimed that, by the use of "Ribbonstone," more brick were required for the construction, with a corresponding increase of labor cost in their laying, which exceeded the contractors' estimate and bid.
The owner's selection of the pattern and size of the brick was in accordance with the specifications. The contractors knew that the specifications called for "Holiday Hill Stone." They were not familiar with this brick or the three sizes and patterns in which it is made. Without informing themselves, the contractors assumed that "Holiday Hill Stone" was a brick of standard thickness or size.
From the testimony of Bounds, it can only be concluded the contractors' estimate and bid were based on the use of brick identical with the size of common brick. However, as pointed out, neither of the patterns was comparable in size or dimensions with common brick. Notwithstanding the contractors' unfamiliarly with "Holiday Hill Stone," no additional information was sought or requested, despite a recital in the forms that if any part of the specifications was not clear reference to the architect should be made before submission of a bid.
The terms of the contract are clear and explicit. No error or fraud is charged in its confection or execution. The parties are bound as they contracted.
Nor does the record establish that the owner agreed to pay extra for the laying of the pattern of brick selected, as contended by defendants. No approval was obtained from the architect for the payment for additional labor allegedly required because of the pattern selected by the owner. No discussion was had relative thereto until claims for extra items were submitted in connection with a request for a final certificate for the balance of the contract price.
No allowance, however, could be made for this item for the additional reason that the added cost for laying of the brick selected is not shown or established. There is no showing what amount, if any, was paid by the contractors to the subcontractors in connection with this work. Bounds testified the architect estimated the difference in cost at $1,300. This, the architect denied. The conclusion, however, is inescapable that this item is not properly chargeable to the owner and must, therefore, be disallowed.
Fifth, no issue is presented as to the allowance of extras itemized, enumerated, and approved by the architect in the sum of $1,698.10, as covered by his order of April 19, 1957, wherein a "complete list of extras on this project" was made. While the record reflects additional charges of $1,215.63, no proof in substantiation of such extras is contained in the record; nor is any issue presented as to them by either party.
Finally, for consideration, is the allowance of the claim of the surety for $4,139.85. The basis of this claim is that, whereas Talbert was required to retain 10 percent of the contract value of each progress payment until the work under the contract was entirely completed, and to retain the final payment for 30 days following the completion of the contract, and until such time as the contractor submitted evidence satisfactory to the architect that all charges for labor and material used in the construction had been paid, Talbert, without the knowledge or consent of the surety, made final payment on the contract to the contractors in the sum of $11,549.85 without requiring the contractors to submit any evidence of the payment of bills for labor and materials, when both architect and Talbert allegedly knew that the contractors owed substantial bills for both labor and materials. Thus, it is alleged Talbert breached his duty to the surety and *820 that the surety was prejudiced by, and to the extent of, the payment made.
Material to the issues thus presented are the following provisions of Articles 4 and 5 of the contract, which read as follows:
"Article 4. Progress PaymentsThe Owner shall make payments on account of the Contract as provided therein as follows: On or about the 10th day of each month 90 per cent of the value, based on the Contract prices of labor and materials incorporated in the work and of materials suitably stored at the site thereof up to the 1st day of that month, as estimated by the Architect, less the aggregate of previous payments; and upon substantial completion of the entire work, a sum sufficient to increase the total payments to 90 per cent of the Contract price.
"Article 5. Acceptance and Final PaymentFinal payment shall be due 30 days after substantial completion of the work provided the work be then fully completed and the contract fully performed.

"Upon receipt of written notice that the work is ready for final inspection and acceptance, the Architect shall promptly make such inspection, and when he finds the work acceptable under the Contract and the Contract fully performed he shall promptly issue a final certificate, over his own signature, stating that the work provided for in this Contract has been completed and is accepted by him under the terms and conditions thereof, and that the entire balance found to be due the Contractor, and noted in said final certificate, is due and payable.

"Before issuance of final certificate the Contractor shall submit evidence satisfactory to the Architect that all payrolls, material bills, and other indebtedness connected with the work have been paid." (Emphasis supplied.)
These provisions relate, of course, and were inserted primarily for the benefit of the surety, since the surety was obligated, insofar as the furnishers of labor and material were concerned, to pay those whom the contractors neglected or failed to pay. Certificate for the aforesaid payment was issued by the architect March 11, 1957. The owner made payment accordingly, notwithstanding the aforesaid provisions of the contract and without submission of evidence of the payment of all payrolls, material bills, and other indebtedness connected with the work.
That both architect and owner had knowledge of the nonpayment of labor and material bills by the contractors is made manifest by Haas' letter to Talbert dated March 28, 1957, in which he stated:
"* * * I can naturally understand your concern regarding the payment by Bounds and Allen of the subcontracts and materials, although I have not appraised you of the matter previously, I have been quite concerned for some time now and have spoken with Ray Allen on several occasions, and he has assured me that he had paid, was paying, or would immediately pay, all the outstanding bills: it goes without saying that this has not been done.
"Prior to the receipt of your letter I had called Mr. Scarborough of Scarborough and Marshall, who hold the bond on Bounds & Allen for this job, and `informally' advised them of the fact that there were outstanding bills and that practically the entire amount of the contract had been paid. I suggested that he look into the matter and the final acceptance for his own protection if nothing else, as, of course, they are completely responsible for any unpaid bills as well as the completion of the work. There is absolutely no responsibility on your part to pay for liens if they are filed. Of course, there is the embarrassment, but I think *821 that we will be able to avoid the filing of any liens by alerting the bonding company. Mr. Scarborough was to have talked with Mr. Bounds late yesterday or today, and he will advise me as soon as he can appraise the situation.
"It is certainly unfortunate that this has happened, but you are completely protected by the bond; and had it not been for this bond, I assure you that we would have required evidence of the payment of bills before authorizing subsequent certificates.

"You will note on the certificates for payment, on which we authorize payments, that the contractor certifies that he has paid all bills for which the certificates are issued. I was advised, although it was not within our jurisdiction to inquire, that the bills were being paid and the purpose of the large amount of the last payment was to cover the outstanding indebtedness. * * *" (Emphasis supplied.)
The payment as made constituted a violation of the owner's obligation stipulated for the benefit of the surety. Out of the payment made, only $7,410 was shown to have been applied in the discharge of claims arising under the contract.
The rule is that suretyship cannot be presumed; it must be expressed and restrained within the limits intended by the contract. LSA-C.C. Art. 3039. Therefore, a surety has a right to rely upon the terms of its contract and, if a creditor intends to look to his surety for payment, he is compelled to preserve, unimpaired, all of his rights against the debtor. A failure of a creditor to preserve all of his rights against the debtor operates as a release of the securities to the extent of the prejudice suffered by the surety thereby. Basso v. Export Warrant Co., Inc., et al., 194 La. 303, 193 So. 654; New England Mut. Life Ins. Co. v. Randall, 42 La.Ann. 260, 7 So. 679; Baker v. Frellsen, 32 La.Ann. 822; Southern Builders' Material Co. v. Foto, 11 La.App. 255, 122 So. 914; McGuire v. Wooldridge, 6 Rob. 47. This rule was reaffirmed in Shreveport Laundries, Inc., v. Sherman, La.App., 7 So.2d 433, 438, wherein it was stated:
"The law is clear that a surety has the right to stand on the terms of his contract and if a creditor makes any change without his consent, even though it is beneficial to the surety, he is released." See, also, Savings & Homestead Ass'n v. Frank et al., 146 La. 198, 83 So. 491; Orleans & J. R. Co. v. International Const. Co. et al., 113 La. 409, 413, 37 So. 10, 11.
In an action brought against a surety, which had issued a performance bond upon the application of a contractor who had agreed to construct a manufacturing plant for plaintiffs, to recover loss incurred by plaintiffs when contractor defaulted and abandoned the project, the Supreme Court of Mississippi, in Metropolitan Casualty Ins. Co. v. Koelling et al., 57 So.2d 562, 564, employed this language in stating the pertinent facts and in reviewing the principles of law applicable thereto:
"The proof showed that from October 4 through November 27, in seven payments, including the original $3,600, the Koellings advanced the sum of $21,240. The value of the work done amounted to only $7,755. Obviously the payments were far in excess of 90% of the work done.
"In 50 Am.Jur., Suretyship, par. 321, page 1116, it is said: `And it is generally held in cases such as of unauthorized payments made to building contractors that a compensation surety is released only pro tanto, to the extent of the injury or prejudice suffered, and not necessarily to the full extent of his obligation. There is, however, authority to the contrary.'
"In Appleman's Insurance Law and Practice, Vol. II, page 751, it is said: *822 `However, it has been held that where an owner made advances to the contractor before the payments were due according to the contract, a surety company which guaranteed the contract is not liable for those payments. At least, the surety would be entitled to credit for the payments so made.' See also Standard Accident Ins. Co. v. Bear, 134 Fla. 523, 184 So. 97, 127 A.L.R. 1, 10.
"This Court recognized the principle of release pro tanto in Picard v. Shantz, 70 Miss. 381, 12 So. 544, where it was said: `The stipulation of the contract that payments should be made by Mrs. Shantz to Collins, the contractor, by installments, as the work progressed, and that the last payment of $250 should be payable only on completion of the house, operated as security to her for the execution of his contract by Collins. Upon familiar and settled principles, Picard, the surety for Collins, was entitled to the benefit thereof; and, to the extent that he was deprived of this security by the act of Mrs. Shantz in anticipating payment to the contractor, he is discharged as surety.' (Emphasis supplied.)
"In Jackson Lumber Co. v. Moseley, 193 Miss. 804, 11 So.2d 199, 201, Picard v. Shantz, supra, was cited and the Court said: `Again, the required retainage is for the mutual benefit and protection of the owner and the surety. * * * If the owner, without consent of the surety, pays out the retainage he is liable to the surety pro tanto, therefor in some jurisdictions.'
"Since the obligees paid out a large percent of the contract price in direct violation of the provisions of the contract and the bond, the surety was, on that account, released pro tanto for all of such overpayments."
It is obvious that the surety was prejudiced by the aforesaid premature payment to the contractor in violation of the contractual obligation with the surety. Pertinent is the provision of LSA-R.S. 9:4806, wherein it is stated:
"* * * In all cases where surety has been furnished, as between such surety and any claimant for labor or material or any sub-contractor, journeymen, cartmen, truckmen, or mechanic, the surety shall be entitled to make only the same defense as the contractor for whom he signed as surety is authorized to make; but as between the surety and the owner, the surety may urge any defense growing out of any violation by the owner changing the contract without the consent of the surety, including the defense that the owner has made anticipated payments, to the extent that the surety is damaged by such violation or anticipated payment." (Emphasis supplied.)
Had the payment been withheld in accordance with the agreement, there would have been preserved, and available to the surety, the sum of $4,139.85 which it could have applied to the discharge of the contractors' unpaid obligations. Manifestly, the surety was prejudiced to the extent of the aforesaid sum.
The judgment was in error in the allowance, out of the fund deposited, of plaintiff's attorney's fee. The statute, LSA-R.S. 9:4810, in making provision for the fixing of an attorney's fee of the attorney of the owner or other person provoking a concursus proceeding, provides that this fee shall not be paid in preference to the claims of laborers or furnishers of material; since, as pointed out, these claims exceed the deposit, there can be no attorney's fee payable therefrom.
An allowance was made as a credit to the owner for the sum of $342.13 for work not performed or work incorrectly performed by the contractors. No opposition has been urged to this claim. The record supports its allowance.
*823 Plaintiff contends, however, that the owner was entitled to rely upon the architect's certificate when making the payment of March 11, 1957, and cites, in support thereof, Louisiana Molasses Company, Ltd., v. LeSassier et al., 52 La.Ann. 2070, 2079, 28 So. 217, and thus that the owner was protected in making payments upon the certificate of the architect. The facts of the cited case and those of Rousselot & Langoumois v. Kirwin, 8 La.Ann. 300, from which it quotes, are readily distinguishable from the facts of the instant case in that the contract here particularly provides that final payment shall not be due until 30 days after the substantial completion of the work, and not then unless the contract has been fully performed and unless all payrolls, material bills, and other indebtedness connected with the work have been paid. The architect's certificate or notice of substantial completion of the work was issued March 11, 1957, the very day upon which the final payment was made. The architect's certificate, therefore, is unavailing as authority for the owner to violate the terms of his contract to the prejudice of the surety.
In accordance with the conclusions herein reached, we make the following tabulation of the owner's ultimate liability:

A. Owner's liability:
 1. Contract price of residence $47,697.00
 a. Extras approved by architect 1,368.10
 b. Water and electricity service charges 356.71
 c. By prejudicial payment 4,139.85
 _________
 d. Total $53,561.66
 2. Credits or offsets due owner:
 a. Payments to contractor:
 (1) 8-13-56 $ 6,012.42
 (2) 9-7-56 10,008.67
 (3) 10-5-56 8,761.50
 (4) 11-2-56 6,250.72
 (5) 3-11-57 11,549.85 42,583.16
 __________
 b. Payments to material
 furnishers:
 (1) Lumber ($2,440.33),
 allowance in
 contract $2,122.47
 (2) Millwork $3,811.62
 (3) Redoing
 millwork 395.38
 _______
 (Allowance in
 contract) 4,207.00
 ________
 (4) Total of allowances 6,329.47
 c. Allowances for work not performed
 in accordance with contract 342.13
 d. Deposit in court (less cost of court
 to be paid therefrom,
 LSA-R.S. 13:4816) 1,427.47
 ________
 e. Total 50,682.23
 _________
B. Balance due by owner in addition to deposit $ 2,879.43
 ==========

*824 This observation appears appropriate as to the payment of cost of court. The statute referred to requires payment of cost out of the fund deposited. Since plaintiff is given credit for the full amount thereof, the surety should recover cost of the plaintiff to compensate for the deficiency, particularly in view of the fact the deposit was not sufficient to cover the owner's liability.
Therefore, the judgment appealed is amended and recast to read as follows:
It is therefore ordered, adjudged and decreed that the deposit of $1,427.47, made herein in the registry of the court, less the cost of court, be paid and delivered to the surety, The Aetna Casualty and Surety Company.
It is further ordered, adjudged and decreed that The Aetna Casualty and Surety Company have and recover judgment of the estate and succession of Silas F. Talbert, deceased, and of his executrix, Mrs. Amelia H. Talbert, for the further and additional sum of $2,879.43, with legal interest thereon from judicial demand until paid, and for all cost; and that, upon payment thereof, the said estate and succession and the executrix thereof be, and they are hereby, discharged from all further liability unto the contractors, the surety, and the lien claimants under that certain contract between Silas F. Talbert, as owner, and Bounds & Allen, as contractors, dated June 21, 1956; and that, accordingly, all liens as filed and recorded be cancelled and erased from the records of DeSoto Parish, Louisiana.
It is further ordered, adjudged and decreed that the claim of the contractors, Bounds & Allen, and of the surety, The Aetna Casualty and Surety Company, as to the sum of $460 for the alleged construction of a foundation for a water fountain, be dismissed as of nonsuit.
The judgment as thus amended and recast be, and the same is hereby affirmed.
Amended and affirmed.

On Rehearing
HARDY, Judge.
We granted plaintiff's application for rehearing in order to permit a re-examination of the basis upon which we predicated our original judgment, and for the further purpose of giving additional consideration to claims of credits in favor of plaintiff-owner against the amount of the judgment which we allowed in our original decree.
In brief filed by diligent counsel for plaintiff it is strenuously urged that our original judgment and the opinion in support thereof manifested errors of both law and fact, which may be briefly summarized as follows:
(1). In treating the substantial payment of March 11, 1957, made by the owner, as constituting a final payment under the provisions of Article 5 of the contract, disregarding certain applicable provisions of said article;
(2). In concluding that the owner had violated his obligation to the surety in making the payment without submission of the evidence of payment of repairs and accounts by the contractor;
(3). In concluding that the owner had knowledge of the non-payment of labor and material bills by the contractors at the time of payment of the amount in question;
(4). In rejecting the contention that the owner was entitled to rely upon the certificate of the architect;
(5). In imputing negligence of the architect to the owner;
(6). In failing to allow credits in favor of the owner of disbursements made by the contractor out of the March 11th payment for the payment of back payroll taxes, payment of a bank note for interim financing, and payment to a laborer for wages due;
(7). And, finally, in failing to enter judgment in favor of plaintiff and against *825 the contractors for the amount of the judgment allowed the surety against the owner in this action.
We proceed to a consideration of the alleged errors, seriatim:
The principal issue tendered on this appeal relates to the alleged violation by the owner of contractual provisions to the prejudice of the surety in making excessive payments to the contractor. More succinctly stated, this case primarily concerns the failure of the owner to retain 10% of the contract price as required by the contract, which document must be construed at one and the same time as the basis of the surety's liability and his protection to the extent of the enforcement of its provisions. There can be no possible question as to the contractual provisions requiring retention of progress payments, nor can there be any doubt as to the correctness of the conclusion that both the architect and the owner violated this provision in connection with the March 11th certificate by the former and the corresponding payment thereof by the latter party. If some language of our original opinion indicated the consideration of this certificate and payment as being final in nature, the resulting error is immaterial for the certificate shows on its face that the 10% Retention requirement was completely disregarded.
While counsel is correct in the position that the contract does not require the owner to obtain evidence of the payment of bills and outstanding accounts due by the contractor, again we comment that this point is immaterial. The damage resulting to the surety, for which it seeks relief in the instant case, is not attributable to failure of the contractor to pay his accounts, but rather to the failure of the owner to protect himself and his surety by adherence to the contractual retention provision.
Counsel is further correct in observing that the record does not establish the owner's knowledge of outstanding unpaid accounts of the contractor at the time of the substantial March 11th payment. The opinion of this Court on original hearing gives the impression that the owner was cognizant of this fact and reference was made to the architect's letter to the owner apprising him of the existing conditions, which communication was dated March 28th, more than two weeks after the payment. Again we concede that the language of our opinion would justify the inference that our conclusion of the owner's knowledge was based upon the architect's letter of March 28th. Obviously this conclusion would have been completely unjustified. The real basis upon which the owner's liability must be predicated is the imputation to him of the knowledge of the architect, which was clearly exposed in the letter to which reference is above made. This communication not only conclusively established such knowledge on the part of the architect, but evidenced a complete disregard on his part of the rights of the surety.
It is strenuously urged that, in any event, the owner was entitled to rely upon the certificate of his architect, by which he was fully protected. In support of this position counsel cites the principle of law enunciated in American Jurisprudence, Volume 9, Section 107 (1960 Supplement) to the effect that the owner is not responsible against the surety on the contractor's bond for mistakes of the architect or engineer which result in payments by the owner made in good faith, even though payments exceed the sums due under the contract. We do not regard this principle as being apropos in the instant case, for the fault of the owner, with which he is chargeable and for which he must bear the responsibility, does not lie in the acceptance and payment of an erroneous certificate, but in the violation of the express provisions of the contract to which he was a party with full knowledge of its conditions. As a factual proposition, it must be pointed out that the certificate in question indicated the full and complete payment of the entire amount due under the contract, in accordance *826 with computations set forth therein, without any retainage whatsoever.
The contention for the allowance of additional credits is predicated upon three items, comprehending (a) payment of back payroll taxes in the sum of $725; (b) payment of the contractor's bank note for interim financing in the sum of $3,000, and payment to Otis Allen (erroneously set forth in brief of counsel for plaintiff as being Otto E. Allen) of the sum of $453.20 (also erroneously stated in brief as being $453.70) for wages.
We find no basis for the allowance of any of the items above noted. The contractor's liability for withholding taxes and his responsibility for a bank loan have no bearing upon the liability of the surety. As for the payment to Otis Allen for wages, the record completely fails to sustain the fact that this payment was made out of the March 11th certificate payment. On the contrary, the witness, Bounds, despite pressing questioning by counsel on examination with respect to this item, refused to testify that the payment to Otis Allen was made out of the funds derived from the source referred to. Specifically, the pertinent question and answer on this point were as follows:
"Q. Mr. Bounds, the record shows that the check for Eleven Thousand and some odd dollars was dated March 11, 1957, and you have stated that the check to Mr. Allen that I referred to was dated March 12, 1957. Therefor, that check evidently arose out of that Eleven Thousand Dollar payment, did it not? A. I don't know whether it did or not because we went as far as we could there and then we sold some cattle off of our place and paid some. Now I don't know which it was. I couldn't actually say. I don't know how that was distributed."
Finally, we concede plaintiff's right to judgment against the contractor to the extent of the amount recovered by the surety.
For the reasons assigned the judgment of this Court as rendered on original hearing is amended to the following extent:
It is further ordered, adjudged and decreed that there be judgment in favor of the plaintiff, Amelia H. Talbert, Testamentary Executrix of the Estate of Silas F. Talbert, deceased, and against the defendant partnership, Bounds and Allen, and the individual members thereof, C. M. Bounds and H. R. Allen, in solido, in the full sum of $2,879.43, with legal interest thereon from date of judicial demand until paid, and for all costs.
As above amended, the judgment of this Court rendered on original hearing is reinstated.
NOTES
[*] Mrs. Amelia H. Talbert, Substituted Plaintiff.