276 So.2d 777 (1973)
NATIONAL AMERICAN BANK OF NEW ORLEANS
v.
SOUTHCOAST CONTRACTORS, INC., et al.
No. 9254.
Court of Appeal of Louisiana, First Circuit.
March 19, 1973.
Rehearing Denied May 14, 1973.
Writ Refused June 29, 1973.
*778 Marian Mayer Berkett and Frederick R. Bott (Deutsch, Kerrigan & Stiles), New Orleans, for defendant and 3rd Party plaintiff-appellant, American Emp. Ins. Co.
Peter J. Butler (Sehrt, Boyle, Wheeler & Butler), New Orleans, for plaintiff-appellee.
R. Paul Greene, Baton Rouge, for defendant & 3rd Party defendant-appellees, Clarence and Thomas Pruyn.
Before LANDRY, TUCKER and PICKETT, JJ.
TUCKER, Judge.
This litigation involves a suit brought by the plaintiff-appellee, National American Bank of New Orleans (Bank), to recover individually and in its capacity as assignee of its borrower, P. H. P., Inc., the sum of $206,602.23, allegedly spent by PHP in order to complete a contract to construct an apartment complex in Houma, Louisiana, plus $50.00 per day as demurrage, attorney fees, and interest.
The named defendants are Southcoast Contractors, Inc., (Southcoast) the building contractor, and American Employers Insurance Company (Employers), which surety concern had executed its bond, guaranteeing the performance of the construction contract between PHP as owner and Southcoast as builder and also securing the payment of liens.
The trial court rendered a judgment in favor of the Bank and against Employers in the principal sum of $191,569.98 plus $38,300.00 attorney fees and $50.00 per day *779 demurrage from September 10, 1966 until the liens on the property were cancelled. Legal interest was awarded on the accrued demurrage from judicial demand, and interest on the demurrage, subsequently accruing, was calculated from the date on which each charge matured. From this judgment Employers has appealed suspensively. Third party judgments in favor of Employers against R. Grady Williams, architect for the subject building contract, Thomas R. Pruyn and Clarence S. Pruyn, indemnitors on the Employers bond have not been appealed.
The facts of the case are relatively undisputed. Southcoast had been in the general contracting business for a number of years, and Employers had on several occasions, previous to the subject transaction, bonded the performance of Southcoast under its building contracts. Southcoast's stockholders were Thomas R. and Clarence S. Pruyn Jr. In the course of making arrangements for the construction of a 60 unit apartment complex in Houma, the Pruyns, together with John H. Higgins, formed PHP. On February 23, 1966 a formal building contract was executed whereby Southcoast, as builder, agreed to construct the apartment project for PHP, as owner, for the sum of $383,000.00 in accordance with the plans and specifications of R. Grady Williams, architect, within 180 days from the date of recordation thereof. The contract provided that Mr. Williams was the supervising architect and all work was to be done under his direction or any other capable expert appointed by lender (Bank). PHP was named as the obligee under Employers bond, and the Bank was referred to in the contract as the "Lender" and "Subrogee" of PHP.
The contract called for partial payments to be made on the 10th day of each month upon certificates signed by the architect.
The record reflects that there was a commitment for permanent financing of the project in the amount of $510,000.00 issued by IFC Collateral Corporation to the owner with the proviso that the permanent loan must be closed no later than June 14, 1967. Despite the fact that the contract obviously was not completed at the time, the owner PHP accepted the contract on May 12, 1967, which acceptance was filed in the mortgage records of Terrebonne Parish. In explanation of the premature acceptance, John Higgins, secretary of PHP, stated the document was executed in order that the 30 day period for the filing of liens against the subject property would begin to run so that a prime mortgage could be furnished the permanent lender by June 14, 1967, the date on which the commitment was to expire. Mr. Higgins assertedly was informed by the contractor that, though the building contract was not completed at the time, it would be finished by June 14, 1967.
From the inception of the contract through June, 1967, amounts totalling $343,393.02 were paid by the Bank for the account of PHP to the contractor Southcoast. Had the schedule of progress payments been followed, these total payments would have indicated that the project was substantially completed. However, this was not the case as subsequent events established. Several meetings were convened between the owner, surety and lender during the summer of 1967, and at a meeting in August of 1967 these interested parties agreed that the owner should complete the contract with the lender furnishing the necessary funds. The contractor had abandoned the construction site, and Employers declined to complete the contract.
Prior to the owner PHP commencing the completion work, it was estimated that the fulfillment of the contract obligations would require $68,788.90. This estimate of completion cost was substantially less than the sum of $206,602.23, allegedly actually expended by the owner PHP in completing the job. This latter sum was over and above the contract price of $383,000.00.
*780 A third party supplier of materials filed suit on August 27, 1967 and obtained a judgment ordering the cancellation of the acceptance of May 12, 1967 on the ground that it was premature and improperly filed.
After owner's intervention and completion of the contract, another acceptance, dated January 26, 1968, was recorded in the mortgage records of Terrebonne Parish on February 7, 1968.
The testimony of Mr. Martin, vice-president of Bank, who, along with Mr. Coleman, inspected and observed the various aspects of the subject construction for Bank, reflects that during the early part of 1967, it came to his attention that certain bills attributable to the complex had not been paid. When Mr. Martin contacted Thomas Pruyn of Southcoast about this turn of events, he was assured by Pruyn that the bills, which were then small, would be taken care of. After receiving additional calls that other bills due by the contractor were not being paid, in late February or early March of 1967, Mr. Martin personally inspected the project and met with Thomas Pruyn, at which time he told Pruyn that the project had not advanced as far as the progress payments made by Bank would indicate. Nevertheless, despite this inspection and meeting with Pruyn, pointing to the imbalance of the progress payments as compared to the proportion of the work actually completed, and after the acceptance of PHP on May 12, 1967, Bank made a payment on the contract in the sum of $7,207.92 on June 28, 1967.
After owner (PHP) undertook the responsibility of completing the construction, lender (Bank) claimed it disbursed $182,929.15 to complete the complex, and that an additional sum of $75,959.59 was due D. H. Holmes Co., Ltd. for the cost of appliances and carpeting in accordance with the plans and specifications. In the initial meeting of June 1967 Employers agreed to file lien bonds on $19,000.00 of disputed and unpaid bills, but the surety continued its refusal to complete the job during all the meetings held between Bank, PHP and Employers during the summer of 1967.
In August of 1967 surety placed the parties on formal notice that it would not complete the job. The instant suit was filed on July 3, 1968, after PHP had assigned to Bank on May 8, 1968 any claims or causes of action which the owner held against the surety on the subject building contract and bond.
The appellant, Employers, recites the following specifications of error in the judgment of the trial court:
"1. In failing to hold that the Bank has no independent right of action against Employers, and that the Bank may assert only the rights of its assignor.
2. In failing to hold that neither PHP nor its assignee may recover from Southcoast or its surety for the alleged cost of completion of the contract.
3. In failing to hold that PHP released Southcoast by its acceptance of Southcoast's performance on May 12, 1967.
4. In failing to hold that the surety was released by the prepayment of the contract price.
"5. In failing to hold that the contract which surety indemnified was materially altered and the surety thereby released.
6. In failing to hold that no viable proof of the cost of completion was submitted by the Bank.
7. In the alternative, in failing to give the surety credit for the cost expended in installing a swimming pool, in enlarging and airconditioning the cabana, in adding on appliances, carpeting, increasing the road, adding rainwater sewers, watermains, increasing electric service, adding five (sic) hydrants, painting sheetrock, adding gutters, waterproofing, electric outlets, gas piping, bathroom title, floor title and steel stairs.
*781 8. In failing to hold the suit prescribed under R.S. 9:4814(B).
9. In awarding demurrage.
10. In awarding demurrage for a period beyond the time when the construction was substantially complete.
11. In holding the surety liable on its performance bond although it failed to give plaintiff judgment against Southcoast, the principal, although Southcoast was sued.
12. In awarding $38,300.00 in attorneys' fees.
13. In failing to give third party judgment against Southcoast."
We are in accord with Employers' initial contention that the Bank has no independent or individual right of action against the surety on the performance bond; that its rights are derivative under the assignment from the owner, and any defenses available to the surety against the owner in an action on the bond can as well be asserted against the lender. The subject bond was written in compliance with R.S. 9:4801 et seq. and under this statute a lender (Bank) is not recognized as an obligee under the bond. It is axiomatic that there are no rights of action on a private works performance bond other than those rights reposed in the obligees named in the bond. See Jimco, Inc. v. Gentilly Terrace Apartments, 230 So.2d 281 (La.App.4th Cir. 1971) and Fireman's Fund Ins. Cas. v. Milstid, 253 So.2d 571 (La.App.1st Cir. 1971). Of course, the subject bond is conventional in the sense that the parties to a building contract for the erection of a private work and an accessory performance bond are controlled by the language, intention and meaning of the documents as contradistinguished from a contract and bond for the erection of a public work, which latter undertakings must contain certain conditions and rights imposed by the statute, which, if omitted, are read into the obligations. While Article XI of the building contract at issue contains the following language: "the lender will have the right to perform the obligations or to exercise any or all of the rights of the owner specified in this contract" the remaining language, particularly the terminal clause, of the building contract clearly indicates that the rights of the lender (Bank) are wholly dependent upon those rights held by the owner. The surety bond names only the owner as the obligee.
A surety bond is an accessory contract. We are not concerned here with the question as to whether or not Bank could have been named as an obligee. We are firmly convinced that Bank was not so named, and its position here is derivative in character, and is governed by the rights which it acquired from the owner by virtue the assignment and/or subrogation set forth in the contract.
Although not recited as a specific issue, there is argument in counsel's brief that there was no valid contract for the reason that the owner and the contractor had no separate identity. This point is not well taken as, according to the testimony, the surety attached no significance to the fact that the corporate owner and the corporate builder were owned to a considerable extent by the same individuals. The owner and the contractor were two separate entities, and there is no proof in the record that either corporation was the alter ego of the other. Both Mr. Cowand and Mr. Cefalu, employees of the surety who were instrumental in negotiating the bond, substantially stated that the similarity of the individuals who owned the two corporations (owner and builder) presented no problem insofar as the surety being willing to execute the performance bond. The weakness of the surety's position on this score is also borne out by the fact that the close similarity of the owners of the two corporations was easily discoverable by reference to the signators who subscribed to the various documents, including the indemnity agreement. In any event the authorized *782 employees of the surety who were involved in the execution of the surety bond were not deluded on this count.
There is no merit to surety's claim that the architect, H. Grudy Williams, was selected by the owner, and, therefore, erroneous acts on the part of the architect in furnishing faulty certificates to the owner in regard to the progress of the work were not chargeable to the surety. Employers signed the contract which designated Williams as the architect, and such objection or reservation on this appointment as may have been entertained by the surety should have been raised at the time of the confection of the contractual documents.
We now consider Employers claim that prepayments on the contract price results in the discharge and release of the surety. It is a recognized precept of law that generally premature payments by an owner to a contractor operate as a release to the surety pro tanto. In the case of Talbert v. Bounds & Allen, 123 So.2d 815 (La.App.2d Cir. 1960) where an owner paid his contractor the full amount of the contract price, without the 10% retainage for a period of 30 days following completion of the job provided in the contract, on the basis of the architect's certificate, when both the owner and the architect knew that the contractors owed substantial bills for both labor and materials, the owner breached his duty to the prejudice of the surety. When it was shown that only $7410.00 of the final payment of $11,549.85 was applied to the discharge of the claims under the contract, the surety's claim for the difference of $4,139.85 was allowed against the owner. This case is authority for proposition that suretyship cannot be presumed, and must be expressed and constricted within the limits intended by the contract. C.C. Art. 3039. A surety has the right to rely upon the terms of its contract and, if an owner-creditor intends to look to his surety for payment, he is compelled to preserve, unimpaired, all of his rights against the contractor-debtor. Failure of the creditor to preserve all of his rights against the debtor effectuates a release of the security to the extent of the prejudice experienced by the surety in consequence thereof. On rehearing in Talbert the court pointed out that the owner's liability as against the surety on the bond was not based upon the mistakes of the architect in the preparation of the certificate which resulted in payments by the owner in good faith, but rather was due to the owner's violation of the express provisions of the contract which required that he wait a period of thirty days after completion in advance of making the final payment on the contract. See also Walters Air Condition Co. v. Firemen's Fund Ins. Co., 252 So.2d 919 (La.App.2d Cir. 1971); Crescent City Construction Corp. v. Monteleone, 209 So.2d 311 (La.App.4th Cir. 1968), cert. den. 252 La. 466, 211 So.2d 330 (1968).
Apropos to this discussion is the rule recited in 9 Am.Jur., Sec. 107 (1963) supplement as follows:
"The rule seems to be settled that where a construction contract requires, as a condition of payments to the contractor, a certificate of estimate ............ of an architect ............ designated in the contract, showing the amounts due, the owner is not responsible, as against the surety on the contractor's bond, for the mistakes of the architect............, and the surety is not discharged from liability to the owner by reason of payments made in good faith in accordance with ............ erroneous certificates, although such payments exceed, in fact, the sums due under the contract."
The specific enactment on which surety bases its position that deviations from the contract involving prepayments is R.S. 9:4806 which reads in part as follows:
".......[A]s between the surety and owner, the surety may urge any defense growing out of any violation by the owner changing the contract without the consent of the surety, including the defense *783 that the owner has made anticipated payments, to the extent that the surety is damaged by such violation or anticipated payment."
The term, "front-loaded" contract, is apparently applied to a situation where the payments to contractors exceed the percentage and degree of the work completed by him. The evidence shows, for instance, that some $32,300.00 was allotted under the contract for the completion of the foundation, and it is not disputed that on the basis of the architect's certificates some $59,000.00 was paid to the contractor for this portion of the work, when there were certain parts of the foundation not then completed. The record reflects that Mr. Higgins of PHP became aware that the project had not advanced as far as the progress payments would denote in late January or early February of 1967, and the Bank became knowledgeable in early March of 1967. On the same dates these parties learned that there were bills outstanding against the construction.
Nonetheless, there is no proof of record that PHP deviated from or violated the terms of the contract. The contract specifically provided that payments were to be made to the contractor on the basis of certificates of estimates furnished by the named architect. The owner and lender were absolved from any responsibility as against the surety for any mistakes, errors and omissions of the architect in preparing the certificates. There is no allegation or showing of any collusion in this regard between PHP and the Bank on the one hand and the architect on the other. The record reflects no violation of, deviation or departure from the terms of the contract by the owner PHP in advance of the default of the contractor.
The complaint of Employers that the amounts expended by Bank for the account of PHP in completing the work after the contractor's default in the summer of 1967 are not properly substantiated and proved with invoices or other probative evidence is not well taken. Such expenditures are supported by ledger entries of Bank and PHP, and cashier's checks of Bank naming PHP and various materialmen as joint payees and Bank checks to general credit account of PHP in payment of laborers. We think the evidence is ample and sufficient with a few exceptions to support these expenditures. As a matter of fact Employers own witnesses testified that cost of the completion was pretty much in line with the requirements of the plans and specifications.
We further find that the plans attached to the contract sufficiently denoted that the carpeting and appliances bought from D. H. Holmes Co., Ltd. for the sum of $75,595.59 were envisioned in the contract for which contractor was responsible. The mere fact that the Holmes account was billed directly to the owner PHP and that a note and mortgage covering the complex premises was given to Holmes as security for the cost of the carpeting and appliances does not establish recognition by the parties that these items were not included in the contract and outside the responsibility of the contractor Southcoast. It is true that the plans and specifications were vague in some degree, but we opine that the documents were subject to a reasonable interpretation, and the testimony of George Saunders, surety's architect, that the items and services not particularly shown on the drawings, including the sewer, rainwater underground, water main, electrical services, additional six feet of roadway, fire hydrant and water meter would cost only an additional $15,000.00 is essentially corroborative of our holding that the plans and specifications were not so defective as to prevent these documents from supporting a valid and binding contract. Incidentally, Mr. Cowand of Employers testified that the plans and specifications were evaluated by surety prior to its execution of the contract and bond, and that it felt that the contract price was fairly well in line. Certainly, if surety had any complaints or reservations on this *784 score, such should have been made known in advance of the execution of the subject agreements.
Another troublesome problem with which we must cope is the legal effect of the acceptance of the contract by the owner PHP filed under the date of May 12, 1967 as between the owner and the surety. Learned counsel for surety ably argues the acceptance by the owner, being an unqualified one, discharges and releases the surety from any further responsibility under its bond. To the contrary astute counsel for Bank argues that the defense of accord and satisfaction, imported by the acceptance, was not affirmatively pleaded nor raised in the trial court, and same cannot be raised on appeal.
In this connection we deem it helpful to quote Article 5 of Surety's original answer, to-wit:
"In May, 1967, owners filed an acceptance of the work in the real property records of Terrebonne Parish, thus waiving all claims against contractor and Surety for any defects in the construction work done by the contractor, including any incomplete work, and Bank and owners are estopped from claiming damages against the Surety because of the alleged violations of the building contract by Contractor."
The above allegation seems to have a dual connotation. In the initial part the language denotes that the owner has waived its claims against Contractor and Surety for defective and incomplete work by virtue of the acceptance. In the latter portion of the paragraph the pleader changes tact and states that the estoppel of the owner in claiming these damages is based on alleged violations of the building contract (presumably to the knowledge of the owner) by Contractor.
Bank earnestly maintains that the said Article 5 falls short of the requisites contained in C.C.P. Art. 1005, particularly Official Revision Comment (e) thereunder, in properly asserting the affirmative defense of accord and satisfaction on account of the acceptance.
On the other hand Surety urges, while conceding that the language of this allegation perhaps suggests estoppel, that the legal concept at work is not estoppel, but rather the extinguishment by the acceptance of the patent obligations to construct. Surety maintains that the acceptance was embodied in the pre-trial order and that the document was admitted into evidence without any objection on the part of Bank.
Under our holding as later set forth the question as to whether or not the acceptance has been affirmatively pleaded as a defense is of little or no importance. However, this document was admitted into and is a part of the record, and we will discuss and examine the authorities which deal with the legal effect of such acceptances, and assay to apply the rules therein to the factual situation here.
The record shows that the acceptance of May 12, 1967 was ordered cancelled by judgment of the District Court of Terrebonne Parish on August 25, 1967. The judgment of cancellation was based upon a suit filed by a third party claimant against the construction site who contended that the acceptance was prematurely and improperly filed. It is the position of Bank that the cancellation proceedings named Employers as a defendant, and, therefore, the judgment of cancellation is effective against the surety. The right of an innocent third party to attack such an acceptance on the ground of prematurity is unquestioned. We entertain grave doubts that this right of attack is equally available to an Owner who would thus repudiate his own act. In view of our appreciation of the instant facts we do not believe that a resolution of this point is necessary.
We have examined the cases of A. M. Blodgett Const. Co. v. Cheney Lumber Co., 129 La. 1057, 57 So. 369 (1912); Welsh v. Hume, 86 So.2d 236 (La.App.Orl.Cir. 1956) and Maloney v. Oak Builders, Inc., 224 *785 So.2d 161 (La.App.4th Cir. 1969) cited by Surety in support of the proposition that the great weight of Louisiana authority is to the effect that an owner even when he accepts a contract prematurely, waives any right to recover under the contract. These cited cases do not involve facts apposite to those here. Primarily the facts in the cases cited are concerned with the legal effect of an unqualified acceptance of a substantially completed construction, limiting any recovery of an accepting owner against a bondsman for defects not reasonably discoverable and denying recovery for patent defects and imperfections. The Blodgett case was concerned with the interpretation of a contract for the construction of a dam after acceptance as to whether or not the contract called for straight and perpendicular wing walls or angular walls. Mostly the cited authorities reflect instances in which the contract had been substantially completed.
The case of Justiss-Mears Oil Company v. Pennington, 132 So.2d 700 (La.App.1st Cir. 1961) likewise involved a contract which had been substantially completed prior to acceptance, where, in defense of an action by the contractor to recover the price thereof, the owner claimed deviations by the contractor. It was held in Justiss-Mears that where a contract was substantially completed the contractor is entitled to the value thereof, and the remedy of the owner for defects therein is the right to seek a diminution of the price to the extent of loss or damage sustained by virtue of the contractor's failure to perform the work as agreed. The cited case further calls attention to the line of jurisprudence which holds that an unqualified acceptance of a work without objection, protest or complaint respecting the manner of performance, bars and estops the owner from the recovery of damages for repairing defects readily observable at the time of acceptance.
While the cited cases expound thoroughly acceptable precepts of law, the facts therein are not analogous to the circumstances here. In the instant case all parties without exception were aware that the contract was not substantially completed on the date of the acceptance May 12, 1967. The Surety makes no contention that it was uninformed with respect to impending default of the contractor. On several occasions during the summer of 1967 the Surety representatives attended meetings with PHP and Bank at which the best means and methods to complete the apartment complex were discussed. Although Surety declined and refused to complete the contract, Employers offered no objection, if it did not actually agree, that the owner would complete the construction with Bank lending the funds for this purpose.
About August 27, 1967 Employers engaged the services of George Saunders, an architect, ostensibly to protect the interests of the Surety in the completion undertaking. Mr. Saunders went to the site of the complex at Houma, La., on some five occasions during latter 1967 and early 1968. This expert observed the progress of the work to complete the project, consulting with Mr. Higgins of PHP, and registered two complaints to Mr. Higgins about, first, the enlargement and enclosure of the cabana and the six foot widening of the project road. The trial judge gave the Surety credit for the cabana item of $6,000.00. It developed that the additional road widening cost was made up by a corresponding reduction of the parking area surrounding the complex units. As above noted in his testimony he listed additional items which he felt the contract plans and specifications did not envision. He did say he thought the plans and specifications were vague and ambiguous and would not support an intelligent bid on the contract. However, he testified that the value of the items not covered by contract was about $15,000.00. This would appear to be a relatively slight variance of a contract calling for $383,000.00. He also told Mr. Cefalu of Employers that the cost of completion *786 of the construction was pretty much in line.
Under the circumstances we do not believe Surety placed any reliance on the premature acceptance when it was in possession of facts clearly indicating the job was not complete at that time. Neither did the Surety change its position nor did it experience injury by virtue of the conduct of owner in prematurely accepting the contract. Certainly any reliance by Surety on the initial acceptance would not be justified. See American Bank & Trust Co. v. Trinity Universal Ins. Co., 194 So.2d 164 (La.App.1st Cir. 1966); affirmed 251 La. 445, 205 So.2d 35. The position of Surety that extinguishment of its contractual obligation results ipso facto from the acceptance rather than by estoppel is not well taken, and, in our opinion, the obligations of the Surety under its bond continue to exist and are enforceable.
Surety's plea of prescription based on the contention that the instant suit was filed on July 3, 1968, more than one year after the recordation of the May 12, 1967 acceptance is not well founded and will be overruled in view of our holding that the said acceptance is without efficacy or validity.
Next the issue of whether or not demurrage in the sum of $50.00 per day after the time limit for the construction under the contract had expired will be considered. Article IV of the building contract provides in part as follows:
"......... to deliver the work free from all liens and all claims for labor and material, in perfect repair, broom clean and in good condition and complete within one hundred eighty days from date of the recordation of this contract in the Mortgage Office of the Parish aforesaid, and should the contractor fail to furnish the work at or before the time agreed upon, said contractor shall pay to, or allow the owner and the lender to retain from any sum due on this contract, by way of liquidated damages, and without any putting in default, the sum of $50.00 per calendar day that the said work shall remain incomplete after the period above mentioned,........."
The Surety maintains that this contractual provision requires only that the construction be completed, and, since the record plainly shows the complex was fully completed, no per diem (demurrage) should be allowed for the failure of the contractor to cancel the inscriptions of liens for labor and materials after the construction was completed. We cannot agree with this rationale. However, it does appear that PHP at least tacitly agreed to an extension of the one hundred eighty day deadline for completion, which ordinarily would have ended on September 10, 1966. The contractor continued work on the job with the actual or tacit approval of owner until about June 28, 1967, and we think that such action on the part of PHP had the effect of extending the contract, to the mentioned date. Of course, the contractual clause in question obviates the necessity of Owner putting contractor in default in order to claim liquidated damages, but an owner certainly may grant extensions and forgive delays under the contract.
Not only was it the duty of Southcoast to complete the contract within the time prescribed in the document, or any extension thereof, but, as well, the contractor was responsible, for delivering the completed project free from liens or other claims for labor and material. In our opinion this demurrage of $50.00 per day, under these circumstances, should run from June 27, 1967 until the complex is delivered to Owner free from liens against the project. We believe that our holding in this regard will comply with the rule that a liquidated damage clause in a contract should be strictly applied.
*787 The final pertinent question called to our attention is the assessment of attorney fees by the trial court in the sum of $38,300.00 against the Surety. At the outset Employers urges that it believed its defenses to the suit were good; that any failure in compliance with the contract was borne equally by PHP and in a sense by Bank, presumably along with Contractor, and under a strict reading of the penalty clause, no attorney fees are assessable. (Emphasis supplied) Employers also claim that all language in the contracts which extend its obligations beyond the Private Works Statute should be read out of the document. Finally, Employers insists that should Bank's interpretation with regard to the size of the attorney fees be accepted, it could well mean that each lienor who filed suit on the bond (there were eleven such suits) would be entitled to a like sum of $38,300.00 in attorney fees.
In answer to the first complaint we have previously determined that Employers' defenses were not good and substantial; the reply to the second position is that we have decided the failure to abide by the contract rests with Employers principal, Southcoast, and that PHP bore no such responsibility. Surety's third objection that the parties to a private works contract and performance bond cannot include covenants therein which extend the obligations beyond those envisaged by the Private Works Statute (R.S. 9:4801 et seq.) is not well taken. See Jimco, Inc. supra; De Frances Marble & Tile Co. v. Coxe, 148 So.2d 83 (La.App.1st Cir. 1962), cert. den. 1963; and Patent Scaffolding Co. v. Ross Corporation, 172 So.2d 364 (La.App.4th Cir. 1965). No cases have been cited nor have we found by independent research any jurisprudence which gainsays or prohibits parties to a contract from stipulating attorney fees therein so long as such fees are reasonable. The parties litigant both cite the case of Maloney v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386 (1970) in support of their opposing views on the subject of attorney fees. Surety is certain that in the cited case the Supreme Court allowed the plaintiff to recover the stipulated percentage of attorney fees because the 5% fee reached the sum of only $4,608.20 which was reasonable as compared to the fee of $38,300.00 awarded here which Employers contends is unreasonable. On the other hand Bank contends that the cited case is authority for the proposition that the parties here were at liberty to contract the payment of attorney fees in a stipulated amount in the event the contractor defaulted on a private construction. Bank further says the court is without right to disregard the clear and unambiguous language of the contract in this regard. This point raised by Surety is without merit.
The court, however, is concerned with Employers' last contention that a literal interpretation of the contractual language might result in Surety being cast for attorney fees greatly in excess of $38,300.00, where, as in this situation, numerous lienors have advanced their claims to suit, and are entitled to recover attorney fees in enforcing their rights under the contract. The court does not believe that the contracting parties intended or envisioned by the language used that the total sum of the attorney fees accruing to various and sundry claimants under the bond could exceed in any wise $38,300.00.
It is our opinion that the trial court erred in allowing Bank to recover attorney fees which exceed 10% of the principal and interest granted in the judgment.
The trial court is correct in its calculation of the sums expended by Bank on behalf of PHP over and above the agreed price for the completion of the contract. The total disbursements established is the sum of $514,610.39, after subtracting two items totalling $11,711.78 not sufficiently *788 proved. The trial judge properly allowed Employers a credit of $6,000.00 for the additional cost of the expanded cabana. To the resultant figure of $508,610.39, the amount still due D. H. Holmes Co., Ltd., by PHP of $75,959.59 for carpeting and appliances brings the total construction cost of the contract to the sum of $574,569.98. Deducting the contract price from the latter figure leaves a balance in the principal sum of $191,569.98, for which amount Bank is entitled to recover from the defendant as assignee of PHP.
For the foregoing reasons the judgment of the trial court is affirmed with respect to the principal sum with legal interest awarded in favor of the plaintiff, National American Bank and against the defendant, American Employers Insurance Company of Boston, Mass.
The judgment award of attorney fees in the specified sum of $38,300.00 is amended to the extent that plaintiff is entitled to attorney fees of 10% on the amount of principal and interest, not including demurrage.
The judgment award of $50.00 per day as liquidated damages in favor of the plaintiff is amended only insofar as June 28, 1967 is fixed as the date for the commencement of the daily demurrage rather than September 10, 1966.
It is further ordered, adjudged and decreed that defendant (third party plaintiff) also recover judgment on its third party demand against third party defendant, Southcoast Contractors, Inc.
In all other respects the judgment of the trial court is affirmed, and the recovery of National American Bank of New Orleans is restricted to and on the basis of its capacity as assignee of owner corporation.
Defendant-appellant is cast with the costs of this appeal.
Affirmed, as amended, and recast.