393 So.2d 830 (1981)
AMERICAN FIDELITY FIRE INSURANCE COMPANY, Plaintiff-Appellee,
v.
PAVIA-BYRNE ENGINEERING CORPORATION, et al., Defendants-Appellants.
No. 14403.
Court of Appeal of Louisiana, Second Circuit.
January 13, 1981.
*832 Dawkins & Coyle by Michael S. Coyle, Ruston, for plaintiff-appellee.
Many, LoCoco & Dwyer by M. Hepburn Many, New Orleans, for defendants-appellants.
Hale M. Walker, Ruston, for City of Ruston.
Before PRICE, MARVIN and JASPER E. JONES, JJ.
JASPER E. JONES, Judge.
Defendants, Pavia-Byrne Engineering Corporation, and its President and Chief Engineer, Edgar H. Pavia, appeal a judgment against them in favor of plaintiff, American Fidelity Fire Insurance, for a sum equal to 71/2% of a contract price of a sewer line installation job performed by a now insolvent contractor for the City of Ruston. Plaintiff answers the appeal contending it was also entitled to a judgment for the same amount against the City of Ruston which was also a defendant in the suit. Ruston had entered into a contract with the D. T. Atkison Company to install approximately 16,000 feet of sewer line in the City of Ruston. The contract was a unit price contract, as opposed to a sum certain contract. Under these circumstances, the contractor does not bid a fixed price to do the entire job, but rather bids a price per unit for the units as estimated by the engineer in the proposal, and gets paid only for as many units as he performs, installs or furnishes. The bid was based on different prices listed in the contract for dissimilar units included within the sewer system to be installed. By way of example, the contractor received more for installation of pipe in areas where the ditch in which the pipe to be laid had to be bored under a street or driveway than he received for installation of pipe in areas where he could simply cut an open ditch. The contractor further received more for installing pipe pressure rated 100 PSI than for installing pipe pressure rated at 47 PSI. The final contract price was not to be determined until the entire project was completed.
Plaintiff executed the contract as surety for the contractor. The sewer system installed under the contract was designed by appellants, Pavia-Byrne Engineering Corporation and Edgar H. Pavia, its President. These appellants were not parties to nor signatories on the construction contract. The evidence establishes that there was a contract between Pavia-Byrne Engineering Corporation and the City of Ruston, by the terms of which it undertook to inspect the work performed by the contractor and to approve the contractor's monthly estimate of work performed. This estimate formed the basis upon which the contractor was entitled, under the terms of the contract, to be paid on the 15th day of each month for the value of the work performed by it in the previous month, less the retainage provided for in the contract.
The contract contained two provisions which described the amount of retainage which Ruston was entitled to withhold from the value of the work performed by the contractor each month. One provision provided that Ruston would retain ten percent (10%) upon the value of the first fifty (50%) percent of the work performed by the contractor and five (5%) percent on the value of the remaining fifty (50%) percent to be performed by the contractor, for a total *833 retainage of 7½%. The other provision stated that after 10% was retained from the first 50% that the subsequent retainage would be reduced in a manner that only 5% would be retained of the total value of the work performed, thereby resulting in Ruston having in retainage at the conclusion of the job 5% of the value of the total work performed.
Appellants provided a full-time inspector on the job who received from the contractor each month his statement of the work performed. This inspector, who was not an engineer, approved the contractor's estimate of the value of the work performed and forwarded the work estimate to Edgar Pavia at his office in New Orleans. Pavia prepared a certificate approving payment to the contractor based upon the estimate of value received from his local inspector. These certificates provided for retainage of 10% on the first 50% of the work and for retainage reducing to 5% on the total work completed after the first 50% had been completed. The certificates approving payment were then signed by a representative of the Ruston Health and Sanitation Department and submitted to Ruston's treasury office for payment. The part of the certificate signed by the Ruston representative contained the estimate of value and the retainage percentage. Ruston made the payment based upon the engineer's approval certificate retaining from the contractor's payment the amount of retainage reflected upon the certificate. After the job was completed a final inspection of the various units included within it was made. When the value of the units of the job was determined in the amount set out for the respective types of work and were totalled, the value of all the work performed was the sum of $233,182.80. If the engineer's certificates on the value of the work performed, upon which Ruston relied, had been correct, the City should have retained funds belonging to the contractor in the amount of 5% × $233,182.80, or $11,659.14. However, the City had only retained $800.02 of the contractor's funds. After completing the job the contractor failed to pay some of the materialmen and subcontractors, and liens were filed upon the job which plaintiff paid in the amount of $23,913.85. Plaintiff filed this suit against appellants and the City of Ruston, contending that these defendants were liable to it for the sum which should have been retained from the contractor calculated upon a 7½% retainage, which amount plaintiff contends would have been available to it to apply upon the liens filed against the job. Plaintiff contended that defendants in the suit were liable to it for this sum because defendants breached their contractual obligations with plaintiff to have protected their security interest in said retainage, and plaintiff alternatively asserted that these defendants owed it a duty under the law of tort to have properly retained under the contract which said defendants negligently failed to do.
The trial court rejected plaintiff's demand against the City of Ruston and awarded judgment against appellants on the theory of negligence. Plaintiff answers the appeal contending that it should also have judgment against the City of Ruston on the theory of contract.
The substantial issues presented on appeal are:
I. Does the surety of a contractor on a public contract have a cause of action against the public body for sums which the public body should have retained from the contract price of an insolvent contractor, but failed to do so under the following circumstance:
A. where the retainage was needed to pay to lien creditors of the contractor but the funds that should have been retained were paid to the contractor by the public body in good faith in reliance upon certificates of the engineer as to the value of the work performed by the contractor and where the contract authorized the City to make payments on this basis?
II. Does the surety of a contract under which the owner fails to fully comply with the retainage provisions, *834 due to the fault of the engineer, have a claim against the engineer in contract for funds which should have been retained and are needed to pay lien creditors where:
A. the engineer has a contract with the owner to provide the engineering services and to approve the amount of retainage, but who has no contract with the surety?
III. Does the surety have a cause of action in tort against the owner's engineer on the theory that the engineer having no contractual duties to the surety, nevertheless has a duty to the surety to properly render engineering services with the care and skill that said services are rendered by other engineers performing similar services under like circumstances, and when the engineer in violation of this duty causes the loss of needed retainage?
IV. Assuming a tort cause of action exists under circumstances described in III above, has the surety here established that the engineer failed to perform with the care and skill of other engineers under like circumstances the duty of certifying to the City of Ruston the value of the work performed by the contractor, and if so, how much loss did this breach of duty cause?

LIABILITY OF THE CITY OF RUSTON
The principal authority relied upon by plaintiff for the liability of the City of Ruston for failure to withhold the retainage provided in the sewer construction contract was the federal decision of Claiborne Parish School Board v. Fidelity & Deposit Co. of Maryland, 40 F.2d 577 (5th Cir. 1930). In this case the school board had retained the amount required by the construction contract from the sums due the contractor and then after the completion of the job paid it to the contractor's bank who was not a lien creditor. The contractor had assigned the retainage to the bank and the school board paid on the basis of the assignment. The school board was aware of the existence of outstanding lien creditors of the contractor at the time it paid the retainage to the bank. The court held the school board liable to the surety in this case because of the bad faith on the part of the school board in depriving the surety of the availability of the retainage with full knowledge that the retainage was necessary and essential to the liquidation of the outstanding lien obligations of the contractor. The court referred to the actions of the school board as being "unlawful conversion and wrongful payment." Id. p. 578. The crux of the basis of liability was the bad faith of the owner.
That case is distinguishable on its facts from the situation here presented where the City of Ruston's failure to retain was based upon its good faith reliance upon the certification by the engineer of the value of the work having been completed by the contractor. Neither the engineer nor the City was aware of the contractor's unpaid bills at the time the retainage was erroneously paid.
The only other Louisiana decision cited by plaintiff as authority for liability on the part of Ruston is the case of Talbert v. Bounds and Allen, 123 So.2d 815 (La.App. 2d Cir. 1960), wherein the owner paid the retainage to the contractor at a time when the owner's architect was aware of outstanding lien creditors. The court found the owner responsible to the surety for the wrongful disbursal of the retainage because while the owner had no personal knowledge of the outstanding lien creditors of the contractor, the architect had such knowledge and it was imputed to the owner. The rationale of the court is as follows:
"The real basis upon which the owner's liability must be predicated is the imputation to him of the knowledge of the architect, which was clearly exposed in the letter to which reference is above made. This communication not only conclusively established such knowledge on the part of the architect, but evidenced a complete disregard on his part of the rights of the surety.

*835 It is strenuously urged that, in any event, the owner was entitled to rely upon the certificate of his architect, by which he was fully protected. In support of this position counsel cites the principle of law enunciated in American Jurisprudence, Volume 9, Section 107 (1960 Supplement) to the effect that the owner is not responsible against the surety on the contractor's bond for mistakes of the architect or engineer which result in payments by the owner made in good faith, even though payments exceed the sums due under the contract. We do not regard this principle as being apropos in the instant case for the fault of the owner, with which he is chargeable and for which he must bear the responsibility, does not lie in the acceptance and payment of an erroneous certificate, but in the violation of the express provisions of the contract to which he was a party with full knowledge of its conditions..." Id. at 825.
The City of Ruston here made no disbursals of retainage, but rather it followed the contract to which the surety was a party in making the retainage. The contract specifically provided that the owner was to make payments based upon the engineer's approval of the contractor's claim for the value of the work performed by it during the previous month, and it was on this basis that the owner made the disbursal. The reason why the retainage was deficient was because the engineer approved the contractor's claim for the value of the work performed, when in fact the contractor's claim substantially exceeded the work actually performed, all as will be more fully discussed at the point in this opinion wherein the liability of the engineer to the surety is discussed in detail.
In the case of National American Bank v. Southcoast Contractors, Inc., 276 So.2d 777 (La.App. 1st Cir. 1973), the court denied a surety's claim against the owner wherein the owner had made the disbursal based upon an architect's certificate of the estimated value of the work performed, for the reason that the owner, in making the disbursal in this manner, was complying with the terms of the contract. The court there said:
"... The contract specifically provided that payments were to be made to the contractor on the basis of certificates of estimates furnished by the named architect. The owner and lender were absolved from any responsibility as against the surety for any mistakes, errors and omissions of the architect in preparing the certificates..." Id. at 783.We conclude that an owner who in good faith makes disbursements based upon the certificate of the engineer, which is the manner provided for making such disbursements by the contract to which the surety is a party, has no liability to the surety for deficiencies in retainage brought about by the fault of the engineer.[1]
It is significant that Ruston, based upon the approved certificates of the engineer, only retained 5% of the value of the contractor's work as certified to by its engineer. The surety contends that Ruston should have retained under the contract 71½% of the value of the work performed by the contractor. If the City, by the terms of the contract, was required to withhold 7½% as retainage, rather than the 5% it purported to withhold, then it could very well be liable to the surety for the portion of the deficiency created by withholding the incorrect percentage of retainage. The City of Ruston was making the disbursals and was fully empowered to make the proper retainage under the terms of the contract to which it was a party, and the terms of which it must be held to be bound by. The *836 engineer had no responsibility for the percentage of retainage. His duties specified in the contract were limited to the inspection of the work and the certification of the correctness of the contractor's monthly estimate. The issue is what was the correct percentage of retainage under the contract.
Plaintiff contends that the following quoted provision designated as "32.3 Payment Determination" in the contract governs retainage:
"On or about the last day of each calendar month during construction, the City's Engineer will estimate the total amount to date of the work done and acceptable according to the specifications, and the value of said work at the price bid or fixed in the contract, including such extra work as may have been approved and completed. Ten percent (10%) of the said value of the work done will be retained by the City. The said percentage will be deducted from the amount earned, and the remainder of the amount earned, less all legal deductions and all previous payments, will be paid to the Contractor not later than the fifteenth (15th) day of the next following calendar month. This ten percent (10%) shall be retained only for the first fifty percent (50%) of value of this contract. After the first fifty percent (50%), five percent (5%) of the value shall be retained from each monthly payment."
A review of this provision would tend to establish that the correct percentage of the retainage that the City should have withheld, based upon the engineer's certificate, would be 7½% and the trial judge so found. The above quoted retainage provision as contained in Section 2 of the General Specifications in the contract is followed later in the contract in Section 3 of the General Specifications, with the following retainage provisions:
"1.0. REQUIREMENTS
Specifications and Contract Requirements for Work Eligible for Federal Participation, Federal Water Pollution Control Act Amendments of 1972 (Public Law 92-500) are incorporated into these specifications as Section 3 of these General Specifications and shall be complied with in every respect except as specifically indicated in this Section.
. . . . .
"5.0. PROMPT PAYMENT
The grantee agrees to make payment to its contractor promptly after receipt of Federal sums due under this grant and to retain only such amounts as may be justified by specific circumstances and provisions of this grant or the construction contract.
Retained amounts shall be limited, except where greater retention is necessary under specific circumstances specifically provided for in the construction contract, to the following schedule:
(a) Retention of up to 10% of payments claimed until construction is 50% complete;
(b) After construction is 50% complete, reduction of the total retainage to 5% of payments claimed provided that the contractor is making satisfactory progress and there is no specific cause for greater withholding; ..." [emphasis supplied].
The contract here involved was substantially financed with Federal funds and the contract document at the outset of the contract so provided:
"This contract is to be financed in part by a grant from the United States Environmental Protection Agency and this grant has a Project Number of WPC-LA305 (Grant No. C-22-0305-01-1)."
The provisions cited above from Section 3 of the contract establish that the retainage shall be 5% of the total of the contract unless "greater retention is necessary under specific circumstances specifically provided for in the construction contract." There are no specific circumstances specifically provided in the clause providing for 7½% retention to justify the 2½% retainage above the 5% retainage that was therein provided for. Because there are no specific circumstances specifically providing for the additional retainage, Part 1.0 of *837 Section 3 requires that Section 3 specifications which includes the 5% total retention provision "be complied with in every respect." The City of Ruston, a recipient of a Federal grant, under retainage provision of Section 3 was required to retain only 5% of the value of the work performed by the contractor. It is significant that the contract specifically provides a duty on the part of the surety to be familiar with each and every phase of the contract document. Quoting from the General Specifications, Section 2, we find the following:
"6.0. BONDSMEN WAIVE RIGHT TO SPECIAL NOTICE
It is distinctly understood and agreed that the bondsmen have familiarized themselves with the wording of this contract and that they waive the right of special notification of changes in the plan contemplated in this contract, of extensions of time, of decreased or increased work, of the cancellation of the contract or of any other act or acts by the City of Ruston or its authorized agents under the terms of this contract; failure to notify bondsmen of changes shall in no wise relieve the bondsmen from their obligations under the contract." [emphasis added].
The surety here was required by the contract to take note of the total reduction in the retainage from 7½% provided for in Section 2 of the General Specifications to the 5% mandated by the retainage provision in the General Specifications, Section 3. For the reasons herein set forth, the City of Ruston violated no contractual provision with plaintiff when it only retained 5% based upon the certification of value from its engineer, rather than 7½%.
For the reasons set forth, we find the trial court correct in denying plaintiff's claim against the City of Ruston.

LIABILITY OF THE ENGINEER
Appellants are not a party to the contract between the surety company and owner, even though the contract designates duties for the engineer to perform as agent for the City of Ruston, with which appellants have a separate contract. Plaintiff cannot recover for its loss from appellants on the theory of contract. C. H. Leavell & Co. v. Glantz Contracting Corp. of La., Inc., D.C., 322 F.Supp. 779 (1971).
In the supreme court case of Day v. National U. S. Radiator Corporation, 241 La. 288, 128 So.2d 660 (1961), the court recognized that if an architect had the duty to inspect and approve the installation (there a boiler without a safety pressure release valve), and his breach of this duty caused damage, he could have been held responsible in tort to the widow and children of a workman who was killed when the boiler exploded. The language of the court was as follows:
"Before discussing this holding we should point out that we do not have here a case where the architects failed to provide in the specifications for a pressure relief valve on the boiler and for other safety devices; or a case where they inspected and approved the installation, or even where they had knowledge of the installation and stood by and permitted the boiler to be tested without having proper safety devices; or a case where they visited the site after the completion of the installation and, knowing that the boiler was to be tested, failed to observe that the boiler was not equipped with the safety devices stipulated in the specifications. Under such circumstances we should not hesitate to say that they breached a duty and that they reasonably should have foreseen that this breach would cause damage." Id. at 666.
The court there found the architect's contract with the owner did not require him to inspect and approve the installation nor did the architect otherwise fit within the circumstances set forth in the quote, and for that reason plaintiff failed to establish a duty owed by the architect, the breach of which brought about the workman's death.
The significance of Day, supra, as applicable to appellants' liability here, is that appellants by the terms of the contract with Ruston had the duty to inspect the work as performed and to approve the estimates of *838 value of the work performed upon which monthly payments were made to the contractor.
In the decision of Calandro Development, Inc. v. R. M. Butler Contr., Inc., 249 So.2d 254 (La.App. 1st Cir. 1971), the court reviewed the cases reflecting a division of authority in other states upon the question of the liability of the owner's engineer and architect to the surety in a construction contract where no privity of contract existed between the engineer, architect, and surety, and then heavily relying on the quoted rationale of the Louisiana Supreme Court in Day concluded:
"An engineer or architect must be deemed and held to know that his services are for the protection, not only of the interests of the owner, but also the surety on the contractor's bond who has no supervisory power whatsoever, and who must perforce rely on the architect or engineer to produce a completed project conformable with the contract plans and specifications...
We hold that the degree of care owed by an engineer to a surety is the same as that owed to the owner. Our jurisprudence uniformly holds that the duty owed by those practicing learned professions to their clients, patients or retainers, is that of exercising that degree of professional care and skill customarily employed by others of the same profession in the same general area. This test has been applied to engineers in Pittman Construction v. City of New Orleans, La.App., 178 So.2d 312; to architects in Maloney v. Oak Builders, Inc., La.App., 224 So.2d 161; to surveyors in Charles Carter & Co. v. McGee, La.App., 213 So.2d 89; to beauticians in Mixon v. Brechtel, La.App., 174 So. 283; to physicians in Mournet v. Sumner, 19 La.App. 346, 139 So. 728, and to dentists in Thibodeaux v. Aetna Casualty & Surety Co., La.App., 216 So.2d 314." Id. at 265.
We find the rationale of Calandro sound and conclude it reflects the law of Louisiana. The contract for the construction of the sewer line placed the duty of inspection and approval of the work upon the appellants:
"The City of Ruston (herein frequently called `the City') will, in general, exercise its authority through Pavia-Byrne Engineering Corporation (herein frequently called `the Engineer'). The Engineer will assign to the work such personnel in the way of engineers, inspectors and other employees as are necessary to the proper conduct of the work and the inspection of materials and workmanship. All explanations or directions necessary for carrying out and completing satisfactorily the different descriptions of work contemplated and provided for under the plans and specifications will be given by the said Engineers and the Engineers will finally decide all matters of dispute between the City and the Contractor involving the character of the work, its quality, and the compensation therefor. All work under this contract shall be done to the satisfaction of the Engineers who shall in all cases determine the amount, quality, acceptability and fitness of the several kinds of work and materials which are to be paid for hereunder and shall decide all questions which may arise as to the fulfillment of this contract on the part of the Contractor and their determination and decision thereon shall be final and conclusive and such determination and decision, in case any question arises, shall be a condition precedent to the right of the Contractor to receive any money hereunder." [emphasis added].
The contract further placed upon appellants the duty of approving the monthly application of the contractor for payment based upon the value of the work performed:
"On or about the last day of each calendar month during construction, the City's Engineer will estimate the total amount to date of the work done and acceptable according to the specifications, and the value of said work at the prices bid or fixed in the contract..."
Edgar H. Pavia admitted the duty of appellants to inspect and approve payments *839 to the contractor. We quote with approval from the excellent written reasons of the trial judge wherein he found appellants violated the duty owed by them to the surety:
"... The question to be resolved in this case is whether there was negligence on the part of Pavia-Byrne Engineering Corporation that resulted in the reduction of the retainage and accordingly the loss that plaintiff sustained as a result of being surety on the contract between D. T. Atkison and the City of Ruston.
In order to fulfill its responsibility in connection with the work to be done, Pavia-Byrne Engineering Corporation employed a resident inspector. The resident inspector, L. L. Mitchell, was on the job site daily in connection with the work done by D. T. Atkison. The evidence in record indicates that L. L. Mitchell had previously served as a resident inspector in connection with certain construction projects. However, the previous experience of L. L. Mitchell had been in connection with building inspections and he had never before served as a resident inspector in connection with pipeline construction work. Mr. Mitchell testified that he did not know that this was a unit price contract until about a month after the work had started. He further testified that he did not keep any notes relative to the quality or quantity of material used by the contractor nor did he keep any separate notes showing his manner of computation of the pipe placed on the ground. Mr. Mitchell insisted that this was not a complicated job to inspect. It appears that Mr. Mitchell utilized, almost exclusively, the distances shown on the plans and specifications in approving the estimates. Mr. Mitchell would determine the quantity of pipe used by reference to the plans and specifications. He did not check the pipe as placed in the ground or physically tape the lineal feet of pipe and verify the distance with grade, contour or elevation computation.
Edgar Pavia was the President and chief engineer of Pavia-Byrne Engineering Corporation. Mr. Pavia resides in Orleans Parish and it was his testimony that he would, when necessary, inspect the job site. He estimated that he was probably never gone from the job site more than two weeks at a time. The matter of the payment of the estimates submitted by the contractor was routinely handled by being submitted to L. L. Mitchell and approved by him. The estimates were then forwarded to Mr. Pavia in New Orleans and were approved by him for payment.
The evidence and testimony in this case leaves no doubt that Edgar Pavia approved the estimates and certified to the City of Ruston that payment should be made of the estimate. Typical of the testimony by Edgar Pavia relating to the approval of the estimates and the authorization of payment is the following:
Q. Are these now two of the mainthe two primary duties of an engineer in inspecting the job is to inspect the quality of work and also to keep up with the work done by the contractor for the purpose of certifying to the owner his payments?
A. Yes.
Q. Would you say that's the two primary responsibilities of an engineer on a job such as this?
A. Well, Mr. Mitchell was an inspector on the job, he's not an engineer.
Q. I'm talking about Pavia-Byrne Engineer-Corporation?
A. Oh, yes, that was your responsibility, yes.
Q. And all of Pavia-Byrne Engineering Corporation certifications for payment were made based on the information supplied by Mr. Mitchell, is that not correct?
A. Yes, not totally supplied by him but supplied by the contractor and checked with him." (tr. 133-134)
When you consider all of the testimony, it is clear to the court the procedure in this matter was that L. L. Mitchell was approving the estimate based almost entirely on merely locating where the work was in progress by reference to plans and specifications and then approving this for payment without actually physically checking and calculating the lineal feet of pipe and *840 the quality of the pipe used. When this approval by L. L. Mitchell was made, Edgar Pavia, without any verification on the site and as the engineer, approved the estimates submitted and signed the certificate to the City of Ruston authorizing payment.
Mr. Robert Aillet, an engineer who was called by the plaintiff, testified in the matter and was asked by the court a hypothetical question concerning the frequency of inspection and authorization of payment. It was his testimony that on this particular contract, considering the job and other circumstances, the engineer should inspect the job weekly in order to make certifications of accuracy. The testimony on the matter by Mr. Aillet is as follows:
`THE COURT: All right, now, assuming that there were a job in Ruston, a construction job of laying a fourteen inch sewer line and the contract required the engineer to inspect the line and to verify or certify periodic payments and that a layman was employed as an inspector, in your opinion as an engineer, how often should the engineer visit or see the job site and verify the work? In your opinion?
THE WITNESS: Your Honor, I thinkI' ll have to qualify an answer there. I think it would depend on the progress of the work or the nature of the work but I would think that say a job of this magnitude should be probably weekly in order to be able to make certain certifications of accuracy.
THE COURT: By the engineer?
THE WITNESS: By the engineer.' (Tr. 70).
In this case there is no question but that Edgar Pavia signed the certification and authorized payment without any inspection of the work covered by the particular estimate. The engineer would take the position that he signed it because the requirement was that a registered engineer signed the estimate. The testimony of Mr. Pavia in this regard is as follows:
`THE COURT: Is it customary for an engineer such as you to certify payments to an owner on progress payments based upon information from a lay inspector who is not an engineer?
THE WITNESS: It's done quite often, Your Honor.
THE COURT: I mean is itis it the accepted practice within the engineering profession?
THE WITNESS: Yes, toit depends on who, how the job is being carried out and how the job is staffed and manned for inspection. In this case the City of Ruston knew we had Mr. Mitchell as our inspector, they approved of Mr. Mitchell, they were satisfied that we had an inspector who would look out for the quality of the work. On that basis Mr. Mitchell not being a registered engineer could not sign the monthly estimates. The City of Ruston was looking to the firm as a representative of the firm we had to have a professional engineer so I signed it.
THE COURT: And you would...
THE WITNESS: We had others but I was handling the Ruston program so I...
THE COURT: And it would be your testimony at least to some of those you signed you had never been on the job site?
THE WITNESS: I'm sorry, I didn't understand you.
THE COURT: As to at least some of the estimates, you had not been on the job site yourself?
THE WITNESS: You mean to check that particular estimate?
THE COURT: Right?
THE WITNESS: Yes, sir, I'd have to say that...' (Tr. 154-155).
The court does not have to determine if damage or loss sustained by plaintiff resulted from the negligence of L. L. Mitchell or Edgar Pavia. They were both employees of Pavia-Byrne Engineering Corporation and the employer would be liable to the plaintiff for loss or damage. However, the court is of the opinion from the testimony and evidence that both of the parties were negligent in performance of their respective duties in connection with the work performed *841 by D. T. Atkison under the contract with the City of Ruston.[2]
L. L. Mitchell relied almost totally on the estimates prepared by the contractor and the plans and specifications so far as making or verifying a computation. Edgar Pavia signed and approved payment because an engineer's signature was `required' in order for payment to be made. He did not inspect the work as it progressed nor attempt to verify the estimate submitted by the contractor. It is true as testified by the engineer called by the defendant, Doan Modianos, that technicians are used by engineers to assist in fulfilling an engineer's responsibility under the contract. However, this expert testified that there was limited verification of the work as done by the technicians. Edgar Pavia's testimony was that he signed the estimates and approved them for payment without any verification.
The defendant engineering firm did not fulfill its responsibility and exercise the degree of care that is normally exercised by an engineer in a similar situation. The lack of the exercise of this degree of care has resulted in a loss to the surety under the contract and the engineer is responsible."
Substantial evidence in the record, and reasonable inferences therefrom, support the finding of facts set forth by the trial judge and we find him not to be clearly wrong.
After all the work required to be performed under the terms of the contract was completed, the job was inspected by Edgar Pavia and the value of the work calculated on the unit price applicable to the various units was found to be $233,182.80, five percent (5%) of which, or the sum of $11,659.14, should have been at this time still in the possession of the owner. Plaintiff alleged, and the appellants admitted in their answer to the interrogatories, that the owner only had in its possession a retainage of $800.02 of the funds belonging to the contractor. The reason for the $10,859.12 deficiency in the retainage was that the value of the work performed monthly had been overestimated by the contractor, which overestimation had been approved by appellants and paid by the City. All of the deficiency in the retainage except for the small sum of $89.00 can be found in two specific areas of the engineer's neglect which created the overpayment to the contractor.
The contract provides that the contractor was to receive substantially less for the installation of pipe pressure rated at 47 PSI than it was to receive for the installation of pipe pressure rated at 100 PSI. Upon final inspection it was determined that the engineer had approved payment for installation of substantial footage of 47 PSI pipe at the unit price provided for installation of 100 PSI pipe, resulting in an overpayment of $7330.05 to the contractor on his monthly estimates. If the resident inspector had been checking the kind, quality and footage of the two types of pipe as they were being placed into the ground, this overpayment would not have occurred. If Edgar Pavia had been making the weekly job inspection tours which engineers should make, as established by plaintiff's engineer expert, and had checked the kind, quality and footage of the two types of pipe that were being installed in each given week, this error should not have occurred. The appellants breached the duty to inspect which caused a breach of duty to disapprove the contractor's applications for excessive payment for the value of the work that was not performed.
The other error neglect, which resulted in an overpayment of $3440, came about because of a confused state of facts, most of which are not clearly established in the record. What apparently happened was that three property owners observed the approach of the sewer line excavation and believing their driveways would be cut by the ditch and thereby damaged, made a *842 deal with some employee of the contractor to bore under their driveways rather than cut through them. These property owners apparently were unaware that the contract required the contractor to bore under the driveways. There is no evidence in the record which establishes how much was paid by the property owners or to whom the payment was made, or whether or not the amount of such payment was ever in fact received by the contractor or someone authorized by him. Pavia testified that during the construction he heard rumors of the driveway transaction but made no effort to substantiate or verify any of the facts. Regardless of what the facts may have been at the time of the final inspection, Edgar Pavia, exercising the right of control over the work as given the engineer by the contract,[3] applied the lesser unit price for a cut ditch to the area of driveways in question rather than the higher unit price of a bored ditch in determining the total consideration to which the contractor was entitled. Pavia reasoned the contractor had received from the property owners the difference between the price of a cut ditch and a bored ditch. This calculation resulted in reduction of the amount to which the contractor was entitled and therefore a reduction in the retainage. The problem was created because the engineer failed to make the reduction in the price paid the contractor in the estimate that the contractor submitted for the month that he placed the line under the driveways of the property owners, and as a result the contractor was overpaid by $3440 that particular month. Accepting as correct the engineer's ultimate solution of the problem of the overzealous property owners who would have received a bored ditch under their driveway under the contract, we can only conclude that if the resident inspector had properly observed the job and checked out the rumor, or if the engineer had been making his weekly inspection trips and had proceeded to solve the problem by an earlier adjustment on one of the monthly work estimates, the retainage would not have been reduced at the end of the work by this sum of $3440.
In brief appellants argue that this $3440 is now in the hands of the City and that if it is the property of the contractor, it belongs to the contractor's surety and under no circumstances can appellants be responsible for it as the trial judge determined. Our answer to this contention is that appellants made the decision that the contractor was not entitled to the $3440 under the prerogative the engineers were given by the construction contract, and if the contractor is not entitled to it, then the City can not possibly be retaining it as the property of the contractor and the surety can have no claim against it from the City. The appellants admitted the City only retained $800.02 of the contractor's funds.
Although we have not been able to determine from the record where the remaining $89 on lost retainage came into being, we cannot conclude the trial judge was manifestly erroneous in concluding that it was also lost due to inadequate inspection performed by appellants.
Appellants argue that their expert engineer testified that it was common to have an error of 1½% made by engineers in the estimates for retainage purposes, and for this reason any award against them should be reduced by 1½% of the total value of the work completed. Plaintiff's expert engineer did not subscribe to this theory and we do not find the trial judge's refusal to apply it clearly wrong. If the engineer had properly done its duty there may have very well been no deficiency in the retainage.
It is our view, for the reasons set forth, that appellants have violated their duty to skillfully inspect the work as it progressed and properly calculate the estimated value of the contractor's work for the purpose of paying him his monthly estimate and that their failure to perform this duty, which was owed not only to the owner, but also to the surety, has brought about *843 a loss to the surety of $10,859.12. The trial judge not only found the engineer negligent in causing the loss set forth by us above, but also found the engineer responsible for the owner's failure to retain 7½% rather than 5%. At the outset we point out that the engineer had no responsibility for determining the correct percentage of retainage. The engineer's responsibility was to determine the value of the work performed upon which payment was to be made less the retainage which was to be determined and applied by the owner. It was the owner's contract with the contractor that authorized the retainage and spelled out the amount of it. As we have earlier pointed out, the correct amount of the owner's retainage here was 5%, but had it been 7½% and had the owner only withheld 5%, the responsibility for the percentage of the retainage withheld would not have been upon the engineer who had no duty to the surety with regard to the correct percentage of the retainage. No neglect or action on the part of appellants could create any liability for them by virtue of the owner's failure to withhold the proper percentage from the contractor's funds.
The trial court's judgment in favor of the surety and against appellants for 7½% of the work actually performed, less the $800.02 retained, is incorrect and must be reduced by 2½% × $233,182.80 (value of the work performed) or the sum of $5829.57, resulting in the proper judgment against appellants being the sum of $10,859.14.
In order to reflect the reduction of the judgment in favor of plaintiff and against appellants, we recast the next to last paragraph of the judgment appealed from to read as follows:
IT IS ORDERED, ADJUDGED AND DECREED that:
1. There be judgment herein in favor of the plaintiff, American Fidelity Fire Insurance Company, and against the defendants, Edgar H. Pavia and Pavia-Byrne Engineering Corporation in solido, in the sum of $10,859.14, together with legal interest from date of judicial demand (July 26, 1978) until paid, and for all costs of court.
As AMENDED, judgment is AFFIRMED at appellants' cost.
NOTES
[1] We find the following statement of the law in 17 American Jurisprudence 2d, Section 105: "Also, it is well settled that under a public works contract which requires, as a condition of payments to the contractor, a certificate or estimate of an architect, engineer, or other person designated in the contract, showing the amounts due, the surety is not discharged from liability to the public body by reason of payments made in good faith in accordance with overestimates or erroneous certificates, although such payments exceed, in fact, the sums due under the contract." Id. p. 282.
[2] The trial judge filed supplemental reasons specifically imputing the negligence of L. L. Mitchell and Edgar Pavia to their employer Pavia Byrne Engineering Corporation and finding Edgar H. Pavia liable to plaintiff in solido with his employer and appellants have assigned no error to these particular conclusions and the solidary judgment against them.
[3] The engineer will finally decide all matters of dispute between the City and the contractor involving the character of the work, its quality, and the compensation therefor.