884 F.2d 886
 CITY OF HOUMA, LOUISIANA, Plaintiff-Appellee,
v.
MUNICIPAL AND INDUSTRIAL PIPE SERVICE, INC., Defendant.
AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY,
Defendant-Third-Party Plaintiff-Appellee-Appellant,
v.
GST ENGINEERS, Gulf South Engineers, Inc., and T. Baker
Smith & Sons, Inc., Third-Party Defendants-Appellants.
 No. 88-3597.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 6, 1989.
Rehearing Denied Nov. 6, 1989.
Rehearing Denied Dec. 20, 1989.
 
 Michael E. Wanek, Gwendolyn S. Hebert, Hulse, Nelson & Wanek, New Orleans, La., for Gulf South Engineers, T. Baker Smith, & G.S.T.
 Howard Marks, Harvey C. Koch, Joe M. Inabnett, Margaret M. Groome, New Orleans, La., for American Mfrs.
 Robert P. Cuccia, Pullaro, Cuccia & Champagne, Houma, La., for City of Houma.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before CLARK, Chief Judge, JOHNSON and SMITH, Circuit Judges.
 JOHNSON, Circuit Judge:
 The City of Houma, Louisiana, after being defrauded by the contractor hired to test and repair faulty sewer lines, sued the contractor and its surety to recover payments made under the contract. The district court found in favor of the City. The district court also granted the surety indemnity from the engineering firm hired to oversee the rehabilitation plus interest and costs. For the reasons stated below, we affirm these findings. However, finding the award of attorney's fees to the City to be improper, that award must be vacated.
 
 I. BACKGROUND
 A. The Raw Facts
 
 1
 In 1974, the City of Houma, Louisiana, and Terrebone Parish received a grant from the Environmental Protection Agency (EPA) to repair the sewer system by locating and testing leaky joints in the pipelines in order to prevent the infiltration of ground water and rainwater. Three engineering firms, Gulf South Engineers, Inc. (Gulf South), T. Baker Smith & Sons (Smith), and Douglass S. Talbot Engineers--Surveyors, Inc. (Talbot) entered into an agreement to create GST Engineers, Inc. (GST), a joint venture, for the purpose of providing "all necessary professional engineering services in order to construct the sewerage collection and treatment facilities as funded" by the parish and federal grants. Agreement Forming GST at 1-2. The EPA funded approximately seventy-five percent of each phase[1] and, along with the State, reviewed and approved each phase of the project.
 
 
 2
 After the evaluation phase of the project was completed, GST itemized the needed improvements and prepared plans, specifications and bid packages. GST evaluated each bid received and made recommendations as to which firms should be awarded the contracts for improvements and construction. In 1981, GST recommended an award of contracts C-1A and C-3A to the low bidder, Municipal and Industrial Pipe Service, Inc. (MIPS). Work began in August of 1981, with 100 days allotted for the C-1A contract and 300 days allotted for the C-3A contract. American Manufacturers Mutual Insurance Company (AMMIC), acting as surety, issued separate performance bonds on each contract with MIPS as principal and the City as obligee/owner.
 
 
 3
 Pursuant to these contracts, MIPS was required to inspect, test, and seal the joints between sections of sewage piping covered by the contracts. MIPS proceeded to accomplish this by inserting a remote-controlled television camera and testing/grouting device, known as a "packer," into the line. A "sled" carried the television camera down into the pipes in order to spot leaky joints. When a joint was located, an air bladder was inflated to pressure-test the joint. If the joint was unable to sustain sufficient pressure (had the potential to leak), grout was pumped into the joint to seal it. After allowing time for the grout to dry, the joint was pressure tested again. The grout holding tanks, equipment, controls, gauges, and television monitor were located in MIPS specially designed vans.
 
 
 4
 The City's contract with MIPS provided that MIPS was to keep logs describing the location of each joint inspected and tested, and any repairs made. MIPS also submitted work logs indicating compliance with the plans and specifications. These logs also served to support requests for payment. GST agreed to have one of its field representatives present at all times to certify MIPS's log entries. The television logs indicate that repair work was last performed on contract C-1A in September 1981 and C-3A in November 1981. Upon the issuance of the certificate of substantial completion, MIPS submitted change orders, which GST approved, increasing the contract amounts by forty percent and thirty-three percent based on the increased number of joints stated to require repairs.
 
 
 5
 The Houma construction project was one of the last projects worked on by MIPS before all principals of that company were indicted in the United States District Court for the Northern District of Georgia on over forty counts of criminal fraud based on MIPS's activities on projects spanning the southern United States. The fraudulent conduct involved MIPS's scheme to garner significant profits by falsifying work logs to indicate that necessary repairs had been performed when, in fact, they had not.
 
 B. Plunging Into the Lawsuit
 
 6
 On January 2, 1984, the City filed a claim in state court against MIPS and their surety, AMMIC, for failure to perform the sewer rehabilitation work called for in MIPS's two contracts with the City, despite the payment of $418,923.11 pursuant to those contracts and the change orders issued thereunder. AMMIC, after removing the case to federal court, filed a third-party complaint for indemnity against GST, Gulf South, Smith, and Talbot. AMMIC alleged that GST's engineers and field representatives failed to perform their monitoring duties under the contract.
 
 
 7
 The case proceeded to a bench trial. The district court rendered judgment in favor of the City in its demand against MIPS and AMMIC for the full amount the City had paid to MIPS plus $41,892.31 in attorney's fees, plus interest and costs. The court also ruled in favor of AMMIC on its demand for indemnity from GST in the amount of $418,923.11 with interest and cost. After ruling that GST was estopped from denying its status as a joint venture, the court apportioned the judgment against GST among Gulf South, Smith, and Talbot.
 
 II. UNCLOGGING THE APPEAL
 A. GST's Claims on Appeal
 
 8
 Each of GST's several claims on appeal are addressed below. Because we cannot conclude that the district court committed reversible error with respect to any of GST's contentions, we affirm.
 
 
 9
 1. Duty ...
 
 
 10
 The district court found that while the agreement between the GST engineers and the City did not laden the engineer with responsibility for faulty construction techniques or the failure of the contractor to perform its work, the agreement "did require GST Engineers to make periodic site visits to determine in general if the work was progressing in accordance with the contract documents." District Court's Finding of Facts n. 12. GST argues that the district court has imposed a duty to detect criminal fraud. We do not agree. GST's failure to apprise the City of MIPS's deceit is not the source of AMMIC's negligence claim. Instead, AMMIC has charged that GST failed to perform its obligation under the contract.
 
 
 11
 The evidence submitted at trial indicates that GST was charged with the duty to monitor and inspect MIPS's work by providing onsite project representatives to view the day to day work performed by MIPS.[2] As part of its duties, GST was to regularly inspect the work as it progressed so as to assure conformance to the contract documents and to verify the testing procedures. GST representatives were to certify work logs intended to document both the location of testing and inspection work performed and the quantity of joint sealing operations.
 
 
 12
 The district court did not define a duty greater than that specified in the contract; the court in no way imposed upon GST a duty to detect criminal fraud.
 
 2. ... And Breach
 
 13
 AMMIC alleged that GST breached its contractual duty by certifying inaccurate or deficient records which purported to verify compliance with the contract specifications. The district court, agreeing that GST failed in its contractual duties, found in favor of AMMIC.[3] We find no error in the district court's finding of a breach of duty by GST.
 
 
 14
 GST claims that it had adequate representatives at the job site, and that its engineers did what could be expected of them in reviewing logs and stopping at job sites on a random basis. Because of the sophisticated scheme MIPS perpetrated, GST argues that it was not possible for its engineers and representatives to have detected defects when these defects were being so skillfully hidden. The court, however, found that GST's field representatives were for the most part untrained, unskilled personnel who employed no reasonable, analytical method calculated to spot performance deficiencies.[4] The court ultimately concluded that although MIPS's deceit was skillfully executed in some regards, other methods used by MIPS should have been apparent and obvious to any reasonably well-trained and observant representative. For example, the logs indicated that there were eight days when 175 to 200 joints were sealed by one truck, thirteen days when 200 to 250 joints were sealed, and thirteen days when 250 to 300 joints were sealed. GST's project manager testified that on a good day, 100 joints could be sealed. That figure is supported by the testimony of GST's project engineer who testified that the entire process per joint took three to four minutes. Based on this estimate, it would take a crew ten hours to seal 150 joints. On some of the particularly heavy days, however, the field representative supervisor billed only five to seven hours of work. The court concluded that GST was negligent in the performance of its contractual inspection duties. Reversible error has not been shown.[5]
 
 
 15
 3. So Who Pays?
 
 
 16
 The district court found that AMMIC was induced to believe that GST was an active joint venture and was estopped from denying that status. This finding is not erroneous. GST filed a joint venture agreement stating the scope of its venture in broad terms, represented itself in its contracts with the City as a going venture, and represented itself to others, including those in attendance at monthly meetings, as a going venture. See, e.g., American Furnace Co. v. Great Southern Air Conditioning Co., 16 So.2d 140 (La.App. 2d Cir.1943).
 
 
 17
 GST's assertion that because Talbot Engineering was the only firm responsible for implementing the C-1A and C-3A contracts, the other two firms should not be liable for Talbot's breach of duty is unpersuasive. The district court properly apportioned liability.
 
 B. AMMIC's Contentions on Appeal
 1. AMMIC's liability as surety
 
 18
 AMMIC appeals the district court's holding that it was liable to the City as surety for MIPS's performance on the repair contracts. First, it argues that the court erred in failing to impute the failure of GST to properly perform its duties to the City, thereby estopping the City from proceeding against AMMIC as surety. Second, AMMIC claims that the court erred in declining to hold that the City had a nondelegable duty to monitor performance of the contract under the relevant contract documents, laws, and regulations.[6]
 
 
 19
 AMMIC's contentions are not supportable. Louisiana courts have acknowledged that "under a public works contract which requires, as a condition of payments to the contractor, a certificate or estimate of an architect, engineer ... the surety is not discharged from liability to the public body by reason of payments made in good faith in accordance with ... erroneous certificates." See American Fidelity Fire Ins. Co. v. Pavia-Byrne Engineering Corp., 393 So.2d 830, 835 n. 1 (La.App. 2d Cir.1981).
 
 
 20
 Neither can AMMIC rely upon EPA regulations governing the relationship between the Agency and a grantee (the City) with respect to the nondelegation of the duties undertaken by the grantee. The federal regulations specify that the City and its agents are responsible, as holders of a public trust, to complete the object of the grant in a professional and diligent manner. To this end, the City utilized the services of GST; the City, however, retained ultimate responsibility for the sewer rehabilitation project. The fact that the City ultimately may be liable to the public and the EPA for the grant monies lost in no way relieves the surety of liability. Louisiana caselaw providing that a surety can be liable even when the public entity's engineer or architect is negligent is not in conflict with the federal regulation since both parties ultimately can be responsible to the public trust. The fact that the EPA looks to the grantee as the responsible party does not allow a private party who has agreed to act as a surety to escape liability.
 
 
 21
 In affirming the district court's finding that AMMIC is liable to the City as surety, we also affirm the court's finding that GST is liable to AMMIC pursuant to the third-party complaint as discussed in the preceding section.
 
 
 22
 2. But do they get attorney's fees?
 
 
 23
 AMMIC asserts that the district court erred in awarding attorney's fees to the City. For the reasons stated below, we agree and vacate the award of attorney's fees.
 
 
 24
 La.Rev.Stat.Ann. Sec. 38:2246 (West 1989) provides:
 
 
 25
 After amicable demand for payment has been made on the principal and surety and thirty days has elapsed without payment being made, any claimant recovering the full amount of his recorded or sworn claim whether by concursus proceeding or separate suit, shall be allowed ten percent attorney's fees which shall be taxed in the judgment on the amount recovered.
 
 
 26
 As AMMIC correctly points out, the Louisiana courts have held that statutes awarding attorney's fees are penal in nature, and, therefore, must be strictly construed. Hub Detectives, Inc. v. Martinez, 515 So.2d 663, 666 (La.App. 3d Cir.1987). While the Louisiana courts have not specifically held that this provision pertains only to the claims of materialmen and laborers, not public entities, our reading of this statute compels us to so hold.[7] The title of the part of the Public Works Act under which the statute appears is "Claims of Subcontractors, Materialmen, and Laborers on Public Works." The statutory reference to "claimants," therefore, limits that reference to subcontractors, materialmen and laborers. Consequently, the district court erred in awarding attorney's fees to the City. The award must be vacated.
 
 III. CONCLUSION
 
 27
 The district court did not err in holding GST liable in a third-party suit brought by MIPS's surety. It was foreseeable that the surety would rely on GST's obligations as stated in the contract between GST and the City. The district court's construction of the duties under the contract was not erroneous, nor was the court's factual finding concerning GST's breach of those duties.
 
 
 28
 The district court did not err in holding AMMIC liable as surety despite GST's negligence. This portion of the court's award is also affirmed. The award of attorney's fees, however, was improper and is vacated.
 
 
 29
 AFFIRMED IN PART, VACATED IN PART.
 
 
 
 [1]
 The sewer rehabilitation program was part of a three-step program undertaken by the City. Step one in the implementation process required an evaluation of the system; step two involved the design of the improvements; and step three involved the actual construction
 
 
 [2]
 The district court found the following relevant facts:
 
 
 [15]
 The work performed by MIPS was supposed to be recorded on a television log filled in by the MIPS employee while a GST inspector was supposed to observe the operations to assure proper performance
 
 
 [16]
 The GST inspector would sign off or approve the log at the end of each day, supposingly (sic) verifying that MIPS had performed the noted actions according to the plans and specifications
 Based on the contract provisions, we cannot conclude that these findings are erroneous. For example, the contract specifically delegates to the engineer the authority and responsibility to reject work not meeting inspection and testing requirements or not accomplished in accordance with the contract documents. Article 9 of the construction contracts requires:
 
 
 [9]
 2 ENGINEER will make periodic visits to the site to observe the progress and quality of the executed work and to determine, in general, if the work is proceeding in accordance with the Contract Documents.... On the basis of his on-site observations as an experienced and qualified design professional, he will keep OWNER informed of the progress of the work and will endeavor to guard OWNER against defects and deficiencies of the work of Contractors
 
 
 [9]
 4 ENGINEER will have authority to disapprove or reject work which is 'defective' which terms (sic) is hereinafter used to describe work that is unsatisfactory, faulty, or defective, or does not conform to the requirements of the Contract Documents or does not meet the requirements of any inspection, test or approval referred to in paragraph 13.2
 Furthermore, the contract indicates that GST's approval of a requested payment constitutes assurance that the "quality of the Work is in accordance with the Contract Documents." Article 14, Construction Contract, Sec. 14.5. The contract specifically defines the method by which these assurances are to be carried out:
 
 
 [5]
 Review of Work, Rejection of Defective Work, Inspection and Tests--
 a. Conduct on-site observations of the work in progress to assist ENGINEER in determining that the Project is proceeding in accordance with the Contract Documents and that completed work will conform to the Contract Documents.
 b. Report to ENGINEER whenever he believes that any work is unsatisfactory, faulty or defective or does not conform to the Contract Documents, or has been damaged, or does not meet the requirements of any inspections, tests or approvals required to be made....
 c. Verify that tests, equipment and systems start-ups and operating and maintenance instructions are conducted as required by the Contract Documents and in the presence of required personnel, and that CONTRACTOR maintains adequate records thereof; observe, record and report to ENGINEER appropriate details relative to the test procedures and startups....
 Exhibit A, Division II, Section B(5).
 
 
 [3]
 GST additionally argues that it owed no duty to AMMIC, the contractor's surety. This argument is not supported by Louisiana law which indicates that professionals such as GST who are hired to review work in progress and make inspections may be held liable to those who might suffer reasonably foreseeable and direct injury because of the professionals' breach of duty. See, e.g., Calandro Development, Inc. v. R.M. Butler Contractors, Inc., 249 So.2d 254 (La.App. 1st Cir.1971). It was foreseeable that AMMIC would rely on GST to monitor construction and that this reliance stemmed from AMMIC's knowledge of the precautions taken by the City in its contract with MIPS. The district court's conclusion that the services of GST engineers were for the protection of both the City and AMMIC is not erroneous. As the Calandro court noted, "[a]n engineer or architect must be deemed and held to know that his services are for the protection, not only of the interests of the owner, but also the surety on the contractor's bond who has no supervisory power whatsoever." 249 So.2d at 265
 
 
 [4]
 In attacking these findings and conclusions, GST argues that, because it rendered professional services, determining the standard of care to which it had to adhere and deciding whether it in fact did so required expert testimony. No such testimony was heard at trial. As AMMIC correctly points out, however, under Louisiana law, such expert testimony is not always necessary to establish an expert's negligence, provided that the matter in question is one that can be easily understood by a layperson. See Milton J. Womack, Inc. v. State House of Representatives, 509 So.2d 62, 65 (La.App. 1st Cir.1987)
 The district court, although it did not specifically state that it was applying this exception to the general rule, clearly relied on the Womack rationale. In ruling on GST's motion for new trial, the district court indicated that the standard was uncomplicated and clearly laid out in the contract, and that the facts were such that any reasonable person could have concluded that a breach of duty had occurred. Particularly in light of the speed at which the logs indicate the MIPS crews worked, discussed infra, this assessment is not erroneous.
 
 
 [5]
 While GST correctly points out that the district court did not make an explicit finding of causation, such a finding is subsumed under the court's ultimate finding of liability based on negligence. Had GST's representatives alerted the City to irregularities in MIPS's work logs and change orders, City officials or AMMIC would have been able to investigate and prevent further fraud by MIPS
 
 
 [6]
 AMMIC also contends that the City made premature payments on the contract which resulted in the discharge of AMMIC's obligation since the surety cannot be held liable if the obligee pays in violation of the contract provisions. The record, however, indicates that the payments were made in accordance with the contract provisions
 
 
 [7]
 The City has been unable to point to a case in which attorney's fees have been awarded to an owner or public entity under the statute rather than on the basis of contractual provisions. No such contractual agreement has been referred to in the instant case, and we are unable to locate any such provision in the record evidence