430 So.2d 696 (1983)
HOGAN EXPLORATION, INC., Plaintiff-Appellee,
v.
MONROE ENGINEERING ASSOCIATES, INC., and David Dumas, Defendant-Appellant.
No. 15233-CA.
Court of Appeal of Louisiana, Second Circuit.
March 28, 1983.
*698 McKeithen, Wear, Ryland & Woodard by Russell A. Woodard, Columbia, for plaintiff-appellee.
Michael S. Ingram, Monroe, for defendant-appellant.
Before PRICE, SEXTON and NORRIS, JJ.
NORRIS, Judge.
David M. Dumas and Monroe Engineering Associates, Inc. appeal an adverse, in solido judgment for damages for breach of a professional services contract.
In November, 1980, Hogan Exploration, Inc. (hereinafter referred to as "Hogan") contracted with David M. Dumas and Monroe Engineering Associates, Inc., Dumas' Company,[1] (hereinafter referred to as "Monroe Engineering") for the purpose of staking and preparing a plat for a proposed gas well site in Caldwell Parish, Louisiana. Monroe Engineering accepted the employment and was furnished with adequate information by Hogan to enable it to stake the well site for the proposed well to be known as the "Crown Zellerbach A-1" Well, located in the Southwest ¼ of the Southeast ¼, Section 4, Township 12 North, Range 2 East, Caldwell Parish, Louisiana. One Monroe Engineering employee headed the crew that staked the well site and another Monroe Engineering employee prepared the plat which was signed by Dumas, a civil engineer and registered land surveyor, certifying that the location as represented on the plat had been staked even though he had never been to the well site. This certified plat was then forwarded to Hogan.
Subsequently, Hogan retained Hogan Drilling Co., Inc. to drill the well at the staked site. Drilling was completed in approximately two days in February, 1981; and on February 10, 1981, Robert F. Meredith, III, a petroleum engineer who is President of Hogan, discovered that the well had been staked and drilled in the wrong quarter *699 section on property which Hogan did not have leased.
After Meredith discovered the error, he immediately contacted Monroe Engineering to put them on notice of the error, contacted the surface and mineral owners of the tract on which the well had actually been drilled in an effort to obtain the requisite leases, and contacted the mineral owners of the property where the proposed Crown Zellerbach well was to have been drilled seeking an extension of time on which to drill the proposed well to avoid losing that lease. Because the unwanted well provided Hogan with no additional information on the viability of its original prospect sought to be tested on the land of Crown Zellerbach where the well had been intended, Hogan had to obtain from Crown Zellerbach an extension of its original farm out agreement and had to duplicate all of its efforts in connection with the drilling of the originally intended Crown Zellerbach well. It was also necessary that the originally intended well be relocated from its proposed site to comply with the 2000 foot spacing requirements of the Department of Conservation. This relocation was directly caused by the erroneous placement of the first well.
In the meantime, Monroe Engineering and Dumas verified and admitted their error in staking the wrong location.
Hogan was successful in securing a lease on the property where the well was actually drilled and renamed the unwanted well "Manville 774 No. 1." After much consideration, Hogan decided to complete the well, outfitting it for the production of oil and gas. Although the log information on the well indicated that the well was a "marginal well," Hogan determined to complete the well in an effort to obtain royalties to minimize the mineral owners' loss and in hopes of mitigating damages generally. However, according to the evidence, the well, in fact, is much less productive than anticipated, will continue to be costly to produce and will not recoup Hogan's completion and workover costs, much less its initial drilling costs.
Thus, Hogan filed suit to recover the cost of drilling the unwanted well, costs incurred in obtaining leases, extensions, and amendments, surface damages and loss of good will and confidence.
In brief reasons for judgment, the trial court found Hogan's action to be founded in contract, found the facts alleged by Hogan to be true and awarded damages against Monroe Engineering and Dumas, in solido, as follows:

1. Drilling costs $32,000.00
2. Clean up costs 2,700.00
3. Lease cost 266.18
4. Recording fees 106.00
5. Permit costs 125.00
6. Surface damages 725.00
7. Survey fee 350.00
8. Reimbursement for Robert
 Meredith's time 2,500.00
9. Reinbursement for Richard
 Keller's time 400.00
10. Lost reputation, humiliation
 and embarrassment 5,000.00
 __________
 TOTAL $44,172.18

It is from the judgment signed in accordance with these reasons that Monroe Engineering and Dumas appeal contending that the trial court erred:
(1) ... in ruling that the appellants were liable to appellee for damages;
(2) ... in finding that appellee had sustained any damage; and
(3) ... in awarding damages to appellee when it failed to meet the required burden of proof of all but three (3) items of damages.
Monroe Engineering and Dumas do not deny that serious error was made by the staking of the well site at the wrong location. However, they initially contend that by securing leases from the mineral and surface owners of the property where the well was erroneously drilled, Hogan waived and/or ratified the surveying error.
In Tiger Well Service v. Kimball Production Co., 343 So.2d 1153 (La.App. 3d Cir. 1977), the general rule regarding the obligations of one who undertakes the performance of contracts for work or services is stated:

*700 It is generally held that under the cited articles every contract for work or services carries an implied obligation on the part of the contractor that he will perform in a good workmanlike manner in default of which he must respond in damages for the losses that may ensue. In Hebert v. Pierrotti, 205 So.2d 888 (La. App. 3d Cir.1968) we stated:
As a general rule, there is implied in every contract for work or services that the work will be performed in a skillful, careful, diligent and good workmanlike manner. LSA-C.C. arts. 1930 and 2769; Wolfe v. LeVasseur-Hinson Construction Company, 147 So.2d 747 (La.App. 2d Cir.1962); Hunter v. Mayfield, 106 So.2d 330 (La.App. 2d Cir. 1958); Rotolo v. Stewart, 127 So.2d 24 (La.App. 1st Cir.1961); Rathe v. Maher, 184 So.2d 256 (La.App. 1st Cir.1966); 17A C.J.S. Contracts § 329, p. 292; 17 Am.Jur.2d, Contracts Sec. 371, p. 814.
Consequently, the relevant inquiry in this case becomes whether the engineer performed the services with the same degree of skill and care exercised by others in the same profession in the same general area. Proof of failure to perform commensurate with these standards ordinarily rests with the plaintiff. The rules applicable to the liability of architects, physicians and other professionals apply to engineers. See American Fidelity Fire Ins. Co. v. Pavia-Byrne Engineering Corp., 393 So.2d 830 (La. App. 2d Cir.1981); Lawyers Title Ins. v. Carey Hodges & Assoc., 358 So.2d 964 (La. App. 1st Cir.1978); Charles Carter & Co. v. McGee, 213 So.2d 89 (La.App. 1st Cir.1968); Pittman Construction Co., Inc. v. City of New Orleans, 178 So.2d 312 (La.App. 4th Cir.1965).
While in the instant case, Hogan offered no proof of the degree of care or skill exercised by other engineers in the same general area, Monroe Engineering and Dumas conceded their error in failing to stake the correct well site. Furthermore, such lack of proof is not fatal to recovery because as stated in Lawyers Title Ins. v. Carey Hodges & Assoc., supra:
Ordinarily, proof of lack of such skill and care or proof of failure to exercise such skill and care in a given instance rests upon plaintiff. We deem it reasonable, however, to except from the general rule those instances when the conduct of a surveyor may be so unprofessional, so clearly improper, and so manifestly below reasonable standards dictated by ordinary intelligence, as to constitute a prima facie case of either a lack of the degree of skill and care exercised by others in the same general vicinity or failure to reasonably exercise such skill and care. We find the omission of a visible drainage structure from a surveyor's plat to fall within the exception. No profession may, by adopting its own standards of performance, method of operation, or paragons of care, insulate itself from liability for conduct which ordinary reason and logic characterize as faulty or negligent. See Favalora v. Aetna Casualty and Surety Company, 144 So.2d 544 (La.App. 1st Cir.1962).
Certainly the staking of a well site in the wrong quarter section after admittedly being provided with sufficient information to stake the well at the proper location constitutes conduct so clearly improper and manifestly below reasonable standards in the engineering profession to render such actions an exception to the general rule of proof and constitutes conduct which ordinary reason and logic characterizes as faulty and negligent. Our conclusion is bolstered by the fact that Monroe Engineering and Dumas have not even attempted to refute the allegations of a breach of a service contract by failure to perform with reasonable skill and care in a good workmanlike manner.
Therefore, Monroe Engineering and Dumas must respond in damages unless their contentions of waiver, ratification or failure to sustain or prove damages have merit.
Monroe Engineering and Dumas initially and strongly argue that Hogan's actions after the discovery of the error in securing leases for the property on which the erroneously staked well was drilled constitute a "... waiver of appellants' surveying error *701 and a ratification of same which bars appellees' recovery."
It is noteworthy at the outset that the affirmative defenses of waiver and ratification were not affirmatively pled by answer as required by La.C.C.P. Art. 1005. However, evidence to the effect that upon discovery of the error after drilling, the well could have been plugged and abandoned was admitted during trial without objection. It is upon this evidence that the defenses of waiver and ratification are based. Consequently, we consider the pleadings to have been expanded by this evidence and will consider the application of these doctrines.
In Michel v. Efferson, 223 La. 136, 65 So.2d 115 (1953) the court stated:
The defense of waiver is a special one and the burden of proof is on the defendants to show that the plaintiff had knowledge of the defects in construction and that she intentionally waived same.
... The rule in regard to a waiver is stated in 56 Am.Jur. Verbo "Waiver", par. 12, page 113, thus:
The essential elements of a waiver, within the definitions already given, are the existence, at the time of the alleged waiver, of a right, advantage, or benefit, the knowledge, actual or constructive, of the existence thereof, and an intention to relinquish such right, advantage, or benefit. Voluntary choice is of the very essence of waiver. [Citations omitted.]
It is clear that because Hogan had drilled a well on property on which it had no lease, it was exposed to liability for trespass and surface damages. The evidence preponderates that Hogan chose to attempt to secure the necessary leases from the surface and mineral owners in an effort to mitigate those damages as well as to provide the mineral owners with at least some royalties to make amends for the mishap. It is further evident that simultaneously, Monroe Engineering and Dumas were put on formal notice that even though Hogan was attempting to secure the required leases and was taking reasonable steps to minimize its foreseen losses, Hogan expected substantial losses to result from the error which it would not excuse. This is made abundantly clear in a letter from Hogan's counsel to Monroe Engineering dated February 10, 1981.
It is well settled that it is the duty of an injured party to mitigate his damages after a wrongful action occurs if he is reasonably able to do so. Crowson v. Bayou State Oil Corp., 367 So.2d 417 (La.App. 2d Cir.1979). This rule applies to both tort and breach of contract actions. Rogers v. Nelson Dodge, Inc., 407 So.2d 443 (La.App. 3d Cir.1982); Landry v. Racca, 386 So.2d 1013 (La.App. 3d Cir.1980).
As with any other affirmative defense, the burden of proof rests with defendants. We find from our review of the record a failure to prove that there was a voluntary and intentional waiver of Hogan's right to hold Monroe Engineering and Dumas accountable for the surveying error under the particular facts and circumstances of this case.
While we have serious misgivings that the theory of ratification is even applicable to the facts of this case, we determine that it will not avail Monroe Engineering and Dumas because:
Ratification, in the law of agency, is the adoption by one person of an act done on his behalf by another without authority. Ratification amounts to a substitute for prior authority. Ledoux v. Old Republic Life Insurance Company, 233 So.2d 731 (La.App. 3rd Cir.1970), writ refused 256 La. 372, 236 So.2d 501 (1970). The burden of proving ratification is on the party asserting it, Tyson v. Robinson, 329 So.2d 781 (La.App. 2nd Cir.1976), and to find ratification of an unauthorized act, the facts must indicate a clear and absolute intent to ratify the act, and so intent will be inferred when the alleged ratification can be explained otherwise. [Bamber Contractors v. Morrison Engineering, 385 So.2d 327 (La.App. 1st Cir.1980).]
Assuming arguendo that ratification is applicable, Monroe Engineering and Dumas *702 had the burden of proving it. The facts of this case do not indicate a clear and absolute intent by Hogan to ratify the erroneous actions; rather, the evidence explains Hogan's actions otherwiseobtaining the leases and completing the unwanted well in an attempt to mitigate damages.
Monroe Engineering and Dumas next argue that Hogan has failed to prove any damages because the Manville well has been in production for several months, it is generating income and such income would compensate Hogan for any claimed loss.
The evidence to support such a contention must preponderate in favor of the defendants because this also is an affirmative defense, namely, extinguishment of the obligation in any manner, which must be proven by Monroe Engineering and Dumas.
The evidence reveals that in addition to the drilling costs, Hogan incurred completion costs in an additional amount of $40,000 plus work-over costs of $7500. Thus, $47,500 would have to be recovered from the well before damages caused by the erroneous staking would begin to be mitigated.
Accepted by the court as an expert in the field of Petroleum Engineering, Hugh G. McDonald, a witness for the defense, testified that based on monthly production reports,[2] the well's actual production was far below the originally estimated production of 150 M.C.F. per day. It was his opinion that the well was very marginal, and he stated that not only would he not purchase the well for $47,000 but that he did not believe anyone knowledgable in the oil and gas business would purchase it for that amount. McDonald further testified that the production records indicated that the well was producing three barrels of salt water per day which he opined to be "very bad." The testimony of McDonald corroborates that of Meredith and indicates that the well would not be commercially productive nor would it pay for the completion and workover costs.
Based on this evidence, the trial court, while not expressly so stating, obviously concluded that the well was not capable of producing income that would compensate Hogan for the costs of drilling the well, obtaining the leases and the other damages sought. This is a finding of fact which lies within a trial court's great discretion which will not be overturned on appeal absent a showing of clear or manifest error.
Hogan did not seek damages for completion costs, workover costs, monthly maintenance or administrative costs of the operating of the Manville well. It is apparent that Hogan concluded that by attempting to mitigate damages through putting the well into production it would assume the risk of this decision and that should the well not be profitable these completion and production costs would not be sought. While an injured party is not required to undertake risky ventures in an effort to mitigate damages, certainly good faith efforts toward mitigating damages are to be encouraged by courts.
However, while it is apparent and noteworthy that had the well been successful, Monroe Engineering and Dumas would have reaped the benefits of Hogan's mitigation efforts by not having to respond in damages, based on the evidence, we find no error in the trial court's finding that the well was not commercially productive and that it would not generate sufficient income to compensate Hogan for its drilling and related losses.
In Vaccaro Bros. & Co. v. Louisville N.R. Co., 11 La.App. 348, 123 So. 355 (La.App. Orl.1929), the court announced the following rule which we apply:
Where one, by his negligence, has created a situation which will probably result in loss to another, he cannot complain if that other, in good faith, does what seems reasonable and proper in an effort to minimize the loss.
* * * * * *

*703 As between the two parties, defendant having made the error should stand the loss.
It is obvious that the negligent staking of the unwanted well created a situation which would result in loss to Hogan unless Hogan was able to mitigate its damages, which in good faith it attempted to do. Certainly, the loss of the drilling and related costs caused by the erroneous staking should be borne by the ones who cause the error. Therefore, Hogan is entitled to the legally recoverable, proven damages it sustained as a result of the error. See La.C.C. Arts. 1926 and 1934(3).
Finally, Monroe Engineering and Dumas complain of the quality of proof of the damages awarded.
It is conceded by Monroe Engineering and Dumas that the awards for surface damages, a portion of the award for the lease costs and recording fees were adequately proven. However, it is argued that the awards for drilling costs, cost of permits, clean up costs and survey fees were not properly proven because of an absence of corroboration in the form of invoices and other documentary evidence.
The evidence leaves no doubt, and it is not rebutted or questioned, that the unwanted well was in fact drilled in the erroneously staked location, completed and placed into production. Meredith testified that the cost of drilling the well in the amount of $32,000 had been paid to Hogan Drilling, Inc. and was an amount charged by Hogan Drilling to other companies for similar services. Meredith is the President of Hogan Exploration, Inc. and is Secretary-Treasurer of Hogan Drilling, Inc. with extensive background as a drilling and petroleum engineer. Furthermore, he had the responsibility of overall supervision of the well. Meredith testified that the cost of the original permit was $100, which was paid to the Department of Conservation. This permit was obtained for the well as reflected on the erroneous plat signed and certified by Dumas. After the well was drilled and the error was discovered, it was necessary to secure an amended permit at an additional cost of $25. Meredith further testified that it cost Hogan $2700 to clean up the site, an expendable item whether the well was completed or abandoned,[3] and that the leases obtained actually cost $266.18 instead of the stated consideration in the leases of $224.70 and other valuable consideration, explaining the difference as being the "other valuable consideration." All of the aforementioned evidence regarding these particular items of claimed damages was uncontradicted, unrefuted and accepted by the trial court as being credible. Finally, as to the $350 survey fee paid for the erroneous survey, Meredith testified unequivocally that it had been paid. Dumas could not remember whether or not it had been paid. The resolution of this conflict depends upon a weighing of credibility, which the trial court weighed in favor of Hogan.
Regarding damages, in Jordan v. Travelers Ins. Co., 245 So.2d 151 (La.1971), the court stated:
This evidence as to Jordan's past employment record is uncontradicted. No attempt was made by cross-examination to question the accuracy of this uncontradicted testimony. We find no reason to question the proof of more-probable-than-not loss of earnings so made, simply because Jordan did not introduce his income tax returns or other records to substantiate whatever loss this testimony proved.5
This statement is amplified by footnote 5:
The defendants took Jordan's discovery deposition in May, 1966, about 18 months before trial. Essentially all of the above information was there educed. The mentally unstable plaintiff was unable to estimate his earnings for the previous years, but he testified that he had filed income tax returns for 1962, 1963, and 1964. It occurs to us that, if the defendants seriously questioned the accuracy of this testimony of prior earnings, they had ample opportunity to secure opposing evidence or access to Jordan's income tax returns for these prior years.
*704 Likewise, we stated in Green v. Farmers Ins. Co., 412 So.2d 1136 (La.App. 2d Cir. 1982):
The trial court made a specific finding of fact that plaintiff's testimony regarding his work experience was credible. This was partially corroborated by the testimony of Raymond Scott. The determination of credibility is a function allocated to the finder of fact at trial because of its better capacity to evaluate a live witness compared with the appellate court's access only to a cold record. Canter v. Koehring, 283 So.2d 716 (La.1973); Williams v. Winn-Dixie of Louisiana, Inc., 404 So.2d 299 (La.App. 1st Cir.1981). Since our review of the record is convincing that these factual findings are not clearly in error we leave them undisturbed. Arceneaux v. Domingue [365 So.2d 1330], supra.
In further support of our acceptance of the trial court's finding relative to this issue, we note that although it is better to introduce corroborating testimony, claims for lost wages have been proven in the past by plaintiff's own reasonable testimony, which was accepted as truthful. See Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (La.1971); Davis v. Bowman, 346 So.2d 225 (La.App. 4th Cir.1977); Bize v. Boyer, 402 So.2d 110 (La.App. 3rd Cir.1981).
Thus, the ultimate question presented in this argument for our resolution is whether or not the trial court abused its great discretion in awarding damages under La.C.C. Art. 1934. Our review of the record leads us to conclude that there was no abuse of discretion in the making of the aforementioned awards; they are adequately borne out by the record.
However, insofar as the damage award relates to reimbursement for Meredith and Keller's administrative time in connection with the resolution of the error and for lost reputation, humiliation, and embarrassment, we must reach an opposite result.
Meredith and Keller were both salaried employees of Hogan. The awards of $2500 and $400 respectively for their time spent during the drilling, analyzation of logs and obtaining leases in connection with the Manville well were solely based on the amount which Hogan bills third parties by the hour for their time when they are loaned out. There is no evidence in the record that Hogan sustained any damage for lost time when these employees could have been contracted out to third parties. Thus, the damage sustained by Hogan in this regard would necessarily have to be limited to the amount of the salary paid to these employees while they were engaged in duties in connection with the unwanted well in lieu of their regular duties. The record is devoid of evidence as to the salaries of either of these employees. Therefore, the trial court had no basis upon which to make a proper damage award, and these awards were based on an erroneous premise. Therefore, we delete these items of damages awarded because there is no basis in the record to make such an award. Any attempt we might make to determine these damages would have to be based on pure conjecture and speculation.
Furthermore, a corporate plaintiff cannot experience mental anguish. M & A Farms Ltd. v. Town of Ville Platte, 422 So.2d 708 (La.App. 3d Cir.1982). Humiliation and embarrassment are of the same generic classification as "mental anguish." Additionally, in Koncinsky v. Smith, 390 So.2d 1377 (La.App. 3d Cir.1980), the court concluded that damage to reputation was not recoverable in a breach of contract action where the object of the contract is physical gratification rather than intellectual gratification. Thus, such damages are not recoverable in this type of action by a corporation. Moreover, Hogan failed to offer any evidence of its reputation in the community either prior to or after the incident on which to base an award for loss of reputation. The only evidence in the record is the testimony of Meredith to the effect that he was embarrassed by the entire incident. This type of testimony is insufficient to prove such damages. See Pisciotta v. Du Saules, 125 So.2d 181 (La.App. 4th Cir.1960).
*705 Accordingly, we amend the trial court judgment to delete the awards for reimbursement of Meredith's and Keller's time and for lost reputation, humiliation and embarrassment and affirm the judgment insofar as it awards the following damages:

(1) Drilling costs $32,000.00
(2) Clean up costs 2,700.00
(3) Lease costs 266.18
(4) Recording fees 106.00
(5) Permit costs 125.00
(6) Surface damages 725.00
(7) Survey fee 350.00
 __________
 TOTAL $36,272.18

As amended, the judgment is affirmed at the cost of appellee.
AMENDED and as amended AFFIRMED.
NOTES
[1] Originally David M. Dumas was contacted by Hogan to complete the surveying work. At that time, Dumas was associated with the firm of George, Dumas, Mason & Associates. Thereafter, that firm incorporated and became Monroe Engineering Associates, Inc. It is admitted by Monroe Engineering, through the testimony of Dumas, that the corporation assumed all of the obligations of George, Dumas, Mason and Associates. Therefore, for purposes of uniformity throughout this opinion, we will refer to the defendant as "Monroe Engineering" even though some earlier contacts and correspondence involved George, Dumas, Mason & Associates.
[2] The monthly production reports considered by McDonald were for the months of August, September, October, November, and December of 1981 and for January and February of 1982.
[3] The figure of $2700 was based on 36 hours work by a dozer and operator at $75 per hour.